## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

UP – FIELDGATE US INVESTMENTS –    **Case No. 6:17-bk-00088**
FASHION SQUARE, LLC,

                                           **Chapter 11**

      Debtor.

_____/

## THE BANCORP BANK'S MOTION
## FOR RELIEF FROM THE AUTOMATIC STAY[1]

Secured creditor, The Bancorp Bank ("Lender" or "Bancorp"), a Delaware chartered

banking corporation, pursuant to 11 U.S.C. §§ 362(d)(1) and (d)(2), hereby moves this Court for

an order terminating or modifying the automatic stay to allow Lender to resume pursuit of the

foreclosure of its collateral, including certain real property interests that include Debtor's interest

in a long term ground lease as described in the mortgage documents (the "Real Property") of an

approximate 1 million square foot retail Shopping Center Project and adjacent building more

commonly known as the "Orlando Fashion Square Mall" (the "Shopping Center Project");[2] the

---

[1] Lender intends to file a Motion to Determine that Debtor Is a Single Asset Real Estate Entity and, as Appropriate, for Relief Pursuant to Section 362(d)(3). However, grounds independent of Section 362(d)(3) presently exist to support granting Lender relief from the automatic stay at this point in the case. The provisions of Section 362(d)(3) do not limit the availability of immediate relief from the automatic stay when such relief is available under other subsections of Section 362. *See In re Pointe One, LLC*, No. 10–30741–KKS, 2012 WL 10007164, at 2 (Bankr. N.D. Fla. Nov. 16, 2012) ("Neither § 362(d)(3) nor the other subsections of Section 362 prohibit a creditor from seeking additional relief [from the automatic stay] even if a debtor is making payments pursuant to § 362(d)(3)."); *In re Star Trust*, 237 B.R. 827, 833 n.2 (Bankr. M.D. Fla. 1999) ("Section 362(d)(3) does not provide a safe harbor . . . [and] does not preempt any other basis for relief or modification of the stay."); *see also In re Adele Benjamin, LLC*, No. 3:13–bk–4141–JAF, 2013 WL 6818210 (Bankr. M.D. Fla. Dec. 26, 2013) (granting, pursuant to § 362(d)(1), a secured creditor relief from the automatic stay in a single asset real estate case).

[2] The Shopping Center Project is located at 3201 East Colonial Drive and 3710 Maguire Blvd, Orlando, Florida 32803.

personal property related to the Shopping Center Project and more particularly described in the various mortgages and security agreements executed by Debtor (the "Personal Property"), (C) the leases relating to the Shopping Center Project (the "Leases"), and (D) the various revenue streams generated by Debtor in connection with the operation and leasing of the Shopping Center Project, including rents (the "Rents") and accounts receivable (collectively, the "Cash Collateral") [all of the foregoing collectively, the "Collateral"], and exercise any and all other *in rem* state law remedies against the Collateral.  "Cause" exists due, among other things, to the "bad faith" filing of this case, and, in any event, Debtor has admitted there is no equity in the Collateral, and Debtor has no reasonable prospect of the ability to confirm a plan of reorganization under applicable bankruptcy law.

Debtor has filed this hugely underwater, single-asset shopping Center Project case in an effort to litigate a two-party dispute in bankruptcy court and forestall the foreclosure action (the "Foreclosure Action") filed in the United States District Court that included a motion to enforce the assignment of rents under section 697.07, *Florida Statutes*, and a motion for an order to show cause for payments under section 702.10(2), *Florida Statutes*.  Debtor's sole asset is the Real Property.

This is a far cry from the case of an honest debtor who has merely fallen on hard times or even incorrectly estimated the business risks.  Here, Debtor's sole principal, corporate manager and member, Scott Fish ("Mr. Fish" or "Manager" or "Guarantor"), acts as if he owns the Shopping Center Project free and clear of the approximate $42 million secured debt encumbering it, which Debtor admits is only worth $22 million.  It appears that Mr. Fish uses Lender's cash collateral to pay insider entities he controls to provide management, security, maintenance, cleaning and other services to the Shopping Center Project, at significantly above

2

market rates, while admittedly failing to pay the ground lease, priming delinquent taxes for 2015 and 2016 of more than $1.6 million and trade debt of $1 million, not to mention not paying interest and principal payments to Lender of $1,094,893.80 in installment payments due Lender just for July, August, September, October and November 2016.[3]  Mr. Fish compounds Debtor's "bad faith" by failing to provide Lender timely, accurate and complete financial information regarding its operations and finances.  Until approximately 11 AM on January 10, 2017 (the day before the hearing on Debtor's Emergency Motion of Debtor-in-Possession for Authority to Use Cash Collateral (the "Cash Collateral Motion")), despite multiple requests, Debtor had not provided Lender with, among other things, a current rent roll, customary financial statements, a general ledger, and other basic back-up documentation, although the applicable loan documents require it to do so.[4]  The effect of Debtor's conduct has been to keep its secured lender in the dark regarding the flow of funds, in particular, to insider related entities, while the Debtor continues to grossly mismanage the Shopping Center Project as discussed below, with little transparency regarding the extent of the Debtor's waste and the devaluation of the Lender's collateral.

In addition, Debtor has no ability to reorganize, and is trying to use chapter 11 to litigate its loan defaults in another forum and avoid the likely appointment of a receiver and loss of its sole asset in the Foreclosure Action.

---

[3] The Loan was previously accelerated due to unpaid installment payments of, principal and interest, and the Debtor's failure to pay more than $900,000 in past due 2015 real estate taxes.  The Debtor released all claims against Lender, if any, on May 5, 2016.  Additionally, the Loan matured, by its own terms on January 1, 2017.

[4] Even now, while Lender is reviewing the financial records produced on January 10, 2017, it does not appear that Debtor has provided complete information regarding the insider service providers to the Debtor.

4842-5731-7696.5

## THE LOAN AND DEFAULTS

On May 5, 2016, Debtor acknowledged and reaffirmed an outstanding secured debt to Lender in the total principal amount of $41,905,156.30 (the "Loan"), with a maturity date of January 1, 2017 (which has now passed).  The Loan is secured by the Collateral, the legal description of the Real Property is attached hereto as **Exhibit 1.**  Debtor's principal, Mr. Fish, executed a guaranty of the Loan.  The key loan documents are described in **Exhibit 2** attached hereto (the "Loan Documents").

Debtor defaulted under the Loan Documents by, without limitation, failing to pay (a) installment payments due under the Loan Documents in the total amount of $403,924.08 due for July, August and September 2016, as well as all payments due thereafter, plus (b) 2015 real estate taxes in the amount of $981,000.00 (*See* Chapter 11 Case Management Summary ("Debtor's Summary") at p. 8), which until paid prime Lender's lien, pursuant to *Florida Statutes* § 197.122(1); and (c) all accrued and unpaid interest and outstanding principal due under the Notes upon acceleration and maturity.

On or about October 4, 2016, Lender, through counsel, sent Debtor and Guarantor written notice of the defaults (the "Default Notice"), a copy of which is attached hereto as **Exhibit 3**. The Default Notice included a notice of acceleration for the Loan and demand for payment of the sums due under the Notes and also made demand for turnover of the Rents pursuant to *Florida Statutes* § 697.07 and the Mortgage and Rents Assignment.  Neither Debtor nor Guarantor caused the Rents to be turned over to Lender, although Debtor collected Rents from the tenants of the Real Property after receiving the Default Notice.[5]

---

[5] Lender reserves all rights to the extent any Rents were paid to professionals or not used for expenses expressly authorized by Section 697.07, Florida Statutes.

The total amount outstanding as of October 4, 2016 was **$42,196,455.37**, plus additional interest (including incremental default interest), attorneys' fees, costs, and other expenses and charges as provided in the Loan Documents.

Accordingly, the Lender is entitled to relief from the automatic stay in order to pursue the Foreclosure Action and exercise any and all other *in rem* state law remedies against Debtor based on the following: (i) for "cause" under 11 U.S.C. § 362(d)(1), because Debtor filed this action in bad faith and has failed to provide Lender with adequate protection; and/or (ii) pursuant to 11 U.S.C. § 362(d)(2), because Debtor has no equity in the Collateral and the Collateral is not necessary to an effective reorganization that is within reasonable prospect.

## ARGUMENT

### A.    Cause Exists to Lift the Automatic Stay under § 362(d)(1) of the Bankruptcy Code.

1.    Although section 362(a) of the Bankruptcy Code stays certain acts against a debtor and property of the estate after the commencement of a bankruptcy case, section 362(d) of the Bankruptcy Code authorizes creditors to petition for relief from the automatic stay. Section 362(d)(1) states as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying , or conditioning such stay –
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

*Id.* § 362(d)(1).

2.    Here, "cause" exists to modify the automatic stay because Debtor filed this action in bad faith, as evidenced by Debtor (a) grossly mismanaging the Shopping Center Project, including the apparent diversion of revenues to insiders and failing to diligently maintain the Shopping Center Project; (b) filing this bankruptcy simply to forestall Lender's legitimate efforts

5

to enforce its legal rights in two party dispute pending in the Foreclosure Action; and (c) failing to properly designate this case as a single asset real estate case, as defined by 11 U.S.C. § 101(51B).

### 1.    Bad Faith Filing

3.    A bad faith filing is "cause" for relief from the automatic stay. *See In re Adele Benjamin*, 2013 WL 6818210, at *3.

4.    In that case, Judge Funk analyzed the "bad faith" factors as set forth by the Eleventh Circuit Court of Appeals in *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988).  Finding the factors present in that case, Judge Funk held the secured creditor should be entitled to relief from the automatic stay.  *See In re Adele Benjamin*, 2013 WL 6818210, at *3.

5.    As in *In re Adele Benjamin*, most, if not all, of the circumstantial factors of "bad faith" enumerated in *In re Phoenix Piccadilly*, 849 F.2d at 1394–95, are present here:

> (i) Debtor has only one asset—the Real Property, in which it does not hold legal title; [6]
>
> (ii) Debtor's unsecured creditors' claims are small in relation to the claims of the secured creditor ($1 million vs. $42 million, respectively);
>
> (iii) Debtor has no employees, (*see* Debtor's Summary at ¶ 29);
>
> (iv) The Collateral is the subject of the Foreclosure Action due to Bancorp's loan to Debtor being in arrearages since July 2016, (*see* Debtor's Summary at ¶ 22);

---

[6] Debtor's Summary notes that Debtor has a paltry $41,475 in cash-on-hand, which resulted from Rents generated from the Real Property, and $5,700 in furniture, fixtures, and equipment, which are appurtenant to the Real Property.  (Debtor's Summary at ¶ 28.)  In addition, it should be noted that the Shopping Center Project is "one project" consisting of the shopping mall and a small parcel connected to the shopping mall parcel which are both managed and maintained by the Debtor as one integrated project.  The Debtor operates under a ground lease, the fee interest is held by an independent third party.

6

(v) Debtor's financial problems involve essentially a dispute between the debtor and the secured creditor which can be resolved in the pending Foreclosure Action; and

(vi) Debtor's filing of its Chapter 11 Petition three days after Bancorp instituted the Foreclosure Action (which included a motion for rent sequestration and a motion for an order to show cause for payments or the vacation of the Shopping Center Project) evidences an intent to delay or frustrate Bancorp's legitimate efforts to enforce its rights.[7]

6.     *In re Adele Benjamin* was a single asset real estate case where the encumbered property's value was less than the debt owed to the secured creditor and the other *Phoenix Piccadilly* factors were met.   Thus, here, like in *In re Adele Benjamin*, this Court should grant Bancorp relief from the automatic stay.

7.     In this regard, the clear purpose of the Debtor's filing was to frustrate Bancorp's right to foreclose on the Real Property, pursuant to the Loan Documents.  Debtor concedes that Bancorp's collection/enforcement actions prompted Debtor to file for bankruptcy.  (*See* Debtor's Summary at ¶ 23.)  Debtor's failure to designate this case as a Single Asset Real Estate case, even though it is one, as defined by 11 U.S.C. § 101(51B), further evidences Debtor's desire to thwart Bancorp's legitimate attempts to enforce its rights.[8]

8.     Debtor filed for bankruptcy in an effort to merely carry on its apparent self-dealing.  The Cash Collateral Motion seeks this Court's permission to carry on paying insider

---

[7] It should be noted that pursuant to its rights under the Loan Documents, the Lender attempted to serve (and did serve some) pre-petition notices to Debtor's tenants to pay rent directly to Lender due to Debtor's defaults. Debtor interfered with the Lender's contractual right to serve the tenant notices.

[8] While the Real Property contains a parcel of land adjacent to the main shopping mall, this additional parcel (which was previously occupied by Anthem College), is contiguous to (and connected by a roadway) to the main shopping mall area.  In addition, this parcel is managed and maintained by the Debtor as a unified project with the main shopping mall.

companies. In fact, expenses to Guarantor-controlled companies comprise the majority of Debtor's estimated expenses, about $400,000.00, over the next 8 weeks.

9.      Though the Shopping Center Project is in need of capital improvements as discussed in Debtor's Summary, (*see* Debtor's Summary at ¶ 14), Debtor does not propose to use cash collateral for such purposes. (*See* Cash Collateral Motion at ¶ 6, Ex. A.) Debtor instead seeks to continue paying affiliated service companies. (*See id.*)

10.     Importantly, Manager knows full well that Debtor has no realistic possibility of reorganizing. To this point, Debtor owes trade creditors almost $1 million, Bancorp more than $42 million, and Orange County more than $1.6 million. Debtor has less than $50,000 in cash on hand, and based on the information available to Bancorp, including Manager's financial position, Debtor has no realistic source of a cash infusion sufficient to confirm a plan within a reasonable period of time.

11.     As further evidence of Debtor's inability to reorganize, Debtor's ground lease has gone into default numerous times over the past couple of years. In order to address the defaults under the ground lease, Lender had to institute an ECF with the proceeds of the sale of an out-parcel to cover the ground lease payments. However, the funds in the ECR are now depleted and the January 2017 ground lease payment was not made.[9] In addition to the failure to pay the ground lease, as explained above, Debtor has failed to pay priming real property taxes for both 2015 and 2016 in an amount exceeding 1.6 million dollars. Debtor's cash collateral budget also fails to provide for the escrow of funds to pay for the 2017 real property taxes. In addition to the failure to pay the priming ground lease and real estate taxes, Debtor has also failed to pay Lender since June of last year. Yet, as of the petition date, despite failing to pay Lender, real estate

---

[9] Obviously, without the ground lease the value of Lender's Collateral is vitiated.

taxes, the ground lease, or trade debt, Debtor has managed to accumulate only $41,000 of cash on hand.  Debtor's current cash position makes clear that either Debtor has grossly mismanaged the Shopping Center Project or its principal, Mr. Fish, has caused Debtor's financial distress by charging excessive fees for management, maintenance, landscaping and security services which are all provided by insider companies.  The management fees paid to Mr. Fish's insider management company, Up Management-Fashion Square, LLC ("Insider Management Company"), provides an obvious and egregious example of the overpayment of fees to insiders. In this regard, Mr. Fish has caused the Debtor to pay (and he seeks to continue to pay as part of the Debtor's cash collateral budget) Insider Management Company a management fee equal to approximately $792,000 per year (or $66,000 per month).  However, Mr. Fish, on behalf of the Debtor and Insider Management Company executed a written Property Management Agreement ("Management Agreement") which provides for a total annual management fee of only $400,000.  *See* Management Agreement, Section 9.  The Management Agreement is attached hereto as **Exhibit 4**.  In addition to the Management Agreement, Mr. Fish, again on behalf of both Debtor and Insider Management Company, executed a Collateral Assignment of Management Agreement and Subordination of Management Fees (the "Collateral Assignment of Management Agreement).  The Collateral Assignment of Management Agreement provides, among other things, that at no time shall the management fee exceed $400,000, per year in the aggregate.  *See* Collateral Assignment of Management Agreement, Section 5.  The Collateral Assignment of Management Agreement is attached hereto as **Exhibit 5.**[10]  Moreover, this does

---

[10] Importantly, the Collateral Assignment of Management Agreement provides that the management fees are unconditionally subordinate in all respects to the lien and payment of the Notes and Loan Documents and that Lender has the right to terminate the Management Agreement.  Of course, Lender's approval of the management fee was premised upon the receipt of payments by Lender and the appropriate management of the Shopping Center Project by the Insider Management Company.  As the Debtor has failed to pay the Lender and has failed to

not include other questionable transfers which do not appear to be for any legitimate business expense.  For example, in addition to the excessive charges being paid to insiders, Mr. Fish historically charged Debtor for his use of private aircraft further depleting Debtor's cash position.  Debtor continued to pay excessive fees to insider companies and for Mr. Fish to travel using private aircraft while failing to pay his creditors, including Lender, the ground lessor, Orange County and trade debt.  Debtor's bad faith is manifest.  As a result, Lender should be granted relief from the automatic stay.

### 2.    Lack of Adequate Protection

12.    Not only did Debtor file this case in bad faith, but Bancorp's secured claim is not adequately protected.  Once a creditor presents a *prima facie* case under Section 362(d)(1) of an inadequate equity cushion, then the burden shifts to Debtor to prove that Bancorp's security interest is adequately protected.  *In re: Henderson Irrevocable Trust*, 395 B.R. at 898.

13.    Because the value of the Collateral is insufficient to secure the entire amount of the Loan,[11] the protection of Lender's interest depends, in part, on preserving "Cash Collateral" and not permitting the unnecessary use of the revenues.  According to the Budget, such expenses to Guarantor-controlled companies appear to comprise the majority of Debtor's estimated expenses over the next 8 weeks, about $400,000.00.  For example, in week one the Budget provides for total rental revenues of $106,000.  Of this amount, the Budget allocates $99,000 as follows: to cleaning services ($19,000); maintenance services ($25,000); security ($22,000) and management ($33,000), which all appear to be insider entities owned or controlled by the

---

appropriately manage the Shopping Center Project, Lender reserves its right to terminate the Management Agreement.

[11] Debtor values the Real Property at $22,000,000, (*See* Debtor's Summary at ¶ 28), which is substantially less than the amount due to Lender ($42,196,455.37 as of October 4, 2016).

Guarantor.[12]  The Budget also appears to provide for the payment of a healthy management fee to an insider, while, at the same time, failing to escrow for real property taxes, pay other creditors, including the ground lease (which primes Lender's lien) or make any payments to Lender.

14.    In the Cash Collateral Motion, Debtor asserts it "will operate on a positive cash flow basis during the interim seven-week period" and therefore Lender's interest in the "Cash Collateral" is adequately protected by a mere replacement lien.  This auspicious statement ignores several key expenses that cannot be ignored (which in and of themselves, render Debtor cash flow negative) – payments under the underlying ground lease and delinquent property taxes. The Budget fails to escrow funds to pay property taxes going forward or to allocate funds to pay the ground lessor.  Further, given the Debtor's history of non-payment of taxes, Debtor cannot be trusted to pay the 2017 real property taxes next year, and should be required to escrow at least $61,416 per month in anticipation of the 2017 real property taxes.  *See* Loan Agreement at p. 10 (requiring Debtor to maintain a real estate tax and insurance reserve account).  The possibility that Debtor may perform as projected does not justify shifting the risk of failure from Debtor to Lender especially where, as here, Debtor has engaged in arguably questionable management and business practices.  *See In re Harbour*, 2011 WL 6097063, at *4, *see also*, Bancorp Bank's Response and Opposition to Debtor's Motion to Use Of "Cash Collateral", which is incorporated herein, DKT # 13.

15.    "A secured creditor is entitled to adequate protection if it can establish that the value of its interest in collateral is declining as a result of the automatic stay."  *In re: Henderson*

---

[12] Pursuant to the limited agreement reached for the use of cash collateral for the first 14 days of this case, the parties agreed to a deduction in the budget for certain insider expenses, without prejudice, to the rights of all parties.

*Irrevocable Trust*; *see also, In re SW Boston Hotel Venture LLC*, 449 B.R. at 175; *In re Rosen*, 208 B.R. 345, 356 (D.N.J. 1997) (cause exists to modify the automatic stay "where a secured creditor lacks adequate protection because there is a threat the value of the property may decline.").

16.    With the Real Property underwater by millions, Debtor's failure to provide for any payments to Lender under the Cash Collateral Budget, interest accruing on over $1.6 million in unpaid real estate taxes and Debtor apparently using the Rents to pay insider service providers, while, according to the November 2016 rent roll, many of the tenant leases have expired or are set to expire shortly, and future potential rents do not suffice as adequate protection.  *See Orix Credit Alliance, Inc. v. Delta Resources, Inc. (In re Delta Resources, Inc.)*, 54 F.3d 722 (11th Cir. 1995) (adequate protection is designed to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property while the automatic stay remains in effect. According to the Debtor's October rent roll, the following leases have recently expired:

| Tenant | Unit | GLA (sq ft) | Monthly | Lease EXP |
|---|---|---|---|---|
| Auntie Anne's Pretzels | K-08 | 227 | 4,416.67 | 6/30/2016 |
| Brow Art | D-66 | 807 | 2,084.75 | 12/31/2016 |
| Candy Shop Boutique | M-31 | 953 | 1,300.00 | 6/30/2016 |
| Charlotte Russe,Inc. | C-10 | 5,938 | 4,833.33 | 12/31/2016 |
| D'Rachel's Boutique | B-16 | 3,305 | 3,500.00 | 8/31/2016 |
| H&Q Jewelers | D-28 | 1,274 | 2,292.14 | 12/31/2016 |
| Jimmy Jazz | B-04 | 3,524 | 3,734.66 | 12/31/2016 |
| Kingsz Anime | M-21 | 1,037 | 1,750.00 | 12/31/2016 |
| Payless Shoe Source | M-18 | 3,206 | 3,412.25 | 12/31/2016 |
| Pete's Karate | M-15 | 2,804 | 2,250.00 | 10/31/2016 |
| Piercing Pagoda | K-02 | 193 | 3,666.67 | 12/31/2016 |
| Piercing Pagoda Plus | K-12 | 193 | 3,125.00 | 12/31/2016 |
| Kuvia Salon | E-01 | 1,270 | 1,000.00 | 10/31/2016 |
| Zales Jewelers | E-04 | 2,271 | 6,250.00 | 12/31/2016 |

17.     In addition, there are at least eight tenants that are seriously delinquent in rental payments.  Importantly, Dillard's, an anchor tenant, is operating at a reduced capacity.  In this regard, Dillard's appears to be operating as a liquidator (rather than as a traditional department store) and has shuttered the entire second floor.  In addition, Dillard's does not even open on Mondays and operates at reduced hours for the remainder of the week.[13]  Equally troubling, Lender was copied on a letter from anchor tenant, JC Penney, to Debtor dated January 10, 2017.  In the letter, JC Penney declared that it would be withholding rent due to Debtor's failure to honor its lease obligations related to the maintenance and repair of the HVAC systems.[14]

In addition its other mismanagement, Debtor has failed to pay for more than a year the sums due to Seritage Finance SRC, LLC, the Sears affiliated entity that owns one-half (1/2) of the ground lease rights in the parking garage.  Debtor owns the other ½ interest.  Debtor owes Seritage sums for the right to use the ½ of the parking garage that it does not own or control, pursuant to certain agreements.  The past overdue amount exceeds $100,000.  Further, Debtor has also failed to pay at least two monthly installment payments due Seritage of $13,497.00 each, totaling more than an additional $27,000.  At the same time, Debtor receives an annual payment of more than $115,000 from Seritage' s affiliate, Sears, for common area maintenance charges due from Sears to Debtor pursuant to other agreements.  Lender is not certain whether Debtor has collected the annual CAM payment for 2017 from Sears, but the Account Receivables aging report provide to Lender, dated January 9, 2017, does not identify Sears as owing anything to Debtor.

---

[13] Upon information and belief, many of the tenants likely have co-tenancy provisions in their leases that reduce their respective rents if certain anchor tenants cease or slow operations.

[14] According to its letter, JC Penney sent Debtor four prior letters requesting that Debtor repair the HVAC systems.

13

A replacement lien as part of adequate protection is the bare minimum.  Here, a replacement lien is not sufficient.[15]

18.    Both because Debtor filed this case in bad faith and because Lender's Collateral is not adequately protected, "cause" under Section 362(d)(1) exists for this Court to grant Bancorp relief from the automatic stay.

**B.    Debtor has no Equity in the Collateral and the Collateral is not Necessary to an Effective Reorganization.**

19.    Section 362(d)(2) of the Bankruptcy Code provides that the automatic stay shall be lifted if Debtor has no equity in the property and the property is not "necessary to an effective reorganization."  11 U.S.C. § 362(d)(2).  Bancorp bears the burden to show a lack of equity in Debtor's Collateral, and Debtor bears the burden to show that the Collateral is necessary to an effective reorganization.  Id. § 362(g)(1)-(2).

**1.    Debtor Has No Equity in the Collateral.**

20.    Debtor owes Bancorp more than $42 million, and Debtor values the Collateral at only $22 million.  *See* Debtor's Summary at ¶ 28.  In addition, real estate taxes from 2015 and 2016 remain unpaid in the amount of more than $1.6 million, and are tax liens on the Real Property.

**2.    The Collateral Is Not Necessary to an Effective Reorganization.**

21.    The Collateral is not necessary to an effective reorganization because Debtor has no reasonable prospect of confirming a plan to reorganize.  In *United States Ass'n of Texas v. Timbers of Inwood Forest Assoc., Inc.*, 484 U.S. 365 (1988), the Supreme Court held that a

---

[15] Of course, the expiring leases and the serious tenant delinquencies also call into serious question the Debtor's ability to ever reorganize.

debtor must show the following to establish that property is necessary to an effective reorganization:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for *an effective reorganization that is in prospect*. This means . . . that *there must be 'a reasonable possibility of a successful reorganization* within a reasonable time.'

Id. at 375-76 (quoting *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 370-71 (5th Cir. 1988)) (emphasis added); *see also In re Wasserman*, 122 B.R. 839, 843 (Bankr. D. Mass. 1991) (citing *Texas v. Timbers of Inwood Forest Assoc., Inc.*, 484 U.S. 365 (1988)); *In re: Henderson Irrevocable Trust*; *In re Brown*; and *In re Dorn*.

22.     "The indispensability of property is not . . . a sufficient basis to establish that the property is necessary for an effective reorganization." *In re New American Food Concepts, Inc.*, 70 B.R. 254, 262 (Bankr. N.D. Ohio 1987) (holding that property was not necessary for an effective reorganization where debtor had no reasonable reorganization prospects and merely asserted that the property was necessary for its survival).   In *In re Cadwell's Corners Partnership*, 174 B.R. 744 (Bankr. N.D. Ill. 1994), debtor was the beneficial owner of a single parcel of real estate that was in receivership during foreclosure proceedings pending when debtor filed bankruptcy under Chapter 11.   *See id.* at 749-50.   Debtor had no equity in the property, as the mortgagee's debt exceeded the value of the real estate.   *See id.* at 759.   The mortgagee sought relief from the automatic stay, arguing that the property was not necessary to an effective reorganization.   Applying the *Timbers* test, the *Cadwell's Corners* court stated that debtor must at least establish that "(1) [i]t is moving meaningfully to propose a plan of reorganization; (2) [t]he proposed or contemplated plan has a realistic chance of success; and (3) the proposed or

4842-5731-7696.5

contemplated plan is not patently unconfirmable." *Id.* (quoting *In re Ashgrove Apartments of DeKalb County, Ltd.*, 121 B.R. 752, 756 (Bankr. S.D. Ohio 1990)) (internal quotation omitted).

23.    The *Cadwell's Corners* court found that debtor failed to establish that it was moving toward a feasible reorganization. *Id.* Instead, the court held that "even at this early stage of the bankruptcy case, Debtor is still required to present some evidence that an effective reorganization is feasible," and therefore held that the mortgagee was entitled to relief from the stay under § 362(d)(2). *Id.*; *see also Rosen*, 208 B.R. at 357 (granting relief from the stay under § 362(d)(2) because debtor did not have a reasonable probability of confirming a plan within a reasonable time because he could not satisfy the claim of the secured Trustee).

24.    Debtor lacks any ability to reorganize based upon, in part, its admissions that the "Collateral" only has a value of $22 million and that there was only $41,000 in its bank account on the petition date, notwithstanding the fact that Debtor: (i) has failed to pay over $900,000 in past due 2015 real estate taxes and over $700,000 in currently due 2016 real estate taxes, [16] (ii) has apparently failed to pay $1 million in general payables, (iii) has not made a single payment to Lender since June 2016, and (iv) has not made any material improvements to the Shopping Center Project's physical plant. Debtor's principal, Mr. Fish, has operated the Shopping Center Project since at least June 2016 as if Debtor owns the Shopping Center Project without any secured creditor by failing to provide timely, complete, and accurate financial information, new or amended leases, and appears to be using his insider management, security, cleaning and

---

[16] In fact, Debtor could not pay its 2014 real estate taxes so it borrowed additional funds from Lender to pay that obligation.

landscaping companies to extract monies from the Shopping Center Project for his personal benefit while other creditors have gone unpaid.[17]

25.    Moreover, there is a serious question regarding Debtor's ability to operate and manage the Shopping Center Project as a fiduciary for the entire estate (assuming the case may proceed notwithstanding Debtor's bad faith filing), in particular, where, as here, Debtor has failed to pay over 1.6 million in unpaid real property taxes, failed to make any payments to Lender for seven months and runs questionable non-business related expenses for Mr. Fish through the Debtor (including expenses for transport on a private aircraft), while apparently employing (and paying) a litany of insider, related companies for management, maintenance, security and cleaning services.[18]

26.    Further, based upon Lender's understanding of Mr. Fish's financial position, Debtor's sole owner lacks sufficient liquidity to infuse capital sufficient to fund any credible plan of reorganization and he has not provided Lender, over the past six (6) months, with any evidence of the ability of Debtor to raise sufficient capital to fund a confirmable plan in a reasonable period of time.  Moreover, as the value of the Shopping Center Project is so far below the amount of the obligation owed to Lender, there is no reasonable basis to believe that a sale of the Shopping Center Project would benefit anyone other than Lender.[19]  Additionally, Lender will control the class of unsecured claims since its debt is full recourse and Debtor cannot

---

[17] As discussed herein, the majority of the expense items Debtor seeks approval to pay in its proposed cash collateral budget appear to be for insider service providers.

[18] Any use by Debtor of the Rents pre-petition after receiving the notice under Section 697.07, *Florida Statutes* for expenditures not specifically authorized by that statute would be further evidence of "waste" and mismanagement.

[19] On this point, Debtor has been shopping the Shopping Center Project on the market for years.  Despite these efforts, the only offer Debtor received was not remotely close to satisfying the debt owed to Lender.

4842-5731-7696.5

illegally "gerrymander" Lender's claim.[20]   To this point, the debt to Lender constitutes an overwhelming 97% of the debt owed by Debtor.  As a result, as set forth above, absent illegal "gerrymandering" Lender will control both the secured and unsecured debt classes in this two party dispute.  As such, Lender will have the ability to vote down any plan proposed by Debtor. Debtor knows this.  In sum, this case boils down to Debtor's effort to gain negotiating leverage. Mr. Fish is attempting to improperly use this forum to extract concessions related to his Guaranty all the while using Debtor to further line his own pockets (for as long as the Court will allow) through payments of excessive fees to insiders and avoiding the appointment of a disinterested party (such as a receiver or trustee) to review the Debtor's questionable transactions and otherwise account to Lender.

27.     Finally, notwithstanding the "white noise," Debtor attempts to make in its "Case Management Summary" about Lender's alleged violation of verbal loan commitments, which are denied, Debtor admits therein that it executed amended loan documents on May 5, 2016, which unequivocally and unambiguously reaffirmed to Lender the debt and Loan Documents and released Lender from any and all claims, known or unknown.[21]   Thus, Bancorp is also entitled to relief from the automatic stay pursuant to Section 362(d)(2).

## CONCLUSION

28.     This case is a classic case of a single-asset Debtor who files Chapter 11 to forestall a foreclosure case, without any reasonable chance of a reorganization and successful emergence from Chapter 11.  Lender is entitled to relief from the automatic stay (i) for "cause"

---

[20] Lender reserves the right, in its discretion, to make an election under Section 1111(b).

[21] In any event, nothing precludes Debtor from attempting to raise its complaints in the pending district court action, where Mr. Fish is a guarantor and to whom the automatic stay does not apply.

4842-5731-7696.5

because Lender's interest in the Collateral is not adequately protected and because Debtor filed

its Chapter 11 petition in bad faith, and/or (ii) because Debtor has no equity in the Collateral and

the Collateral is not necessary to an effective reorganization that is in reasonable prospect.

Lender therefore respectfully requests that this Court modify the automatic stay to allow Lender

to pursue the Foreclosure Action and schedule a foreclosure sale, and exercise any and all other

*in rem* state law remedies against Debtor.

Respectfully submitted,

*/s/ Kevin A. Reck*
Mark J. Wolfson (FBN 0352756)
Nicholas E. Williams (FBN 106801)
FOLEY & LARDNER LLP
100 N. Tampa Street, Suite 2700
Tampa, Florida  33602
(813) 229-2300 (telephone)
(813) 221-4210 (facsimile)
Primary email: mwolfson@foley.com
Primary email: nwilliams@foley.com
Secondary email: crowell@foley.com

and

Kevin A. Reck (FBN 0505552)
Primary email: kreck@foley.com
Secondary email: bshelley@foley.com
Foley & Lardner LLP
111 N. Orange Avenue, Suite 1800
Orlando, FL 32801
Telephone:  407.423.7656
 Facsimile:   407.648.1743

**Counsel for Creditor The Bancorp Bank**

4842-5731-7696.5

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed with the Court via the ECF system and furnished on this 17th day of January, 2017 via U.S. Mail to the 20 largest unsecured creditors and to:

**UP Fieldgate US Investments-Fashion Square, LLC**
33201 E. Colonial Drive
Orlando, FL 32803

**R. Scott Shuker**
Latham Shuker Eden & Beaudine LLP
P.O. Office 3353
Orlando, FL 32802

**Elena L. Escamilla**
Office of the United States Trustee
400 W. Washington Street, Suite 1100
Orlando, FL 32801

**United States Trustee – ORL**
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801

*/s/ Kevin A. Reck*
Attorney

4842-5731-7696.5