UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:                                    CASE NO.: 6:17-bk-00088-CCJ

UP FIELDGATE US INVESTMENTS –            CHAPTER 11
FASHION SQUARE, LLC

                                          **Emergency Hearing Set for**
            Debtor.                       **February 21, 2017 at 2:00 p.m.**

_____/

<u>**EMERGENCY MOTION FOR AN ORDER PURSUANT TO FED. R. BANKR. P. 9019
APPROVING THE SETTLEMENT AGREEMENT BY AND AMONG THE DEBTOR
AND THE BANCORP BANK, IN ADDITION TO, MOTION TO SHORTEN TIME FOR
NOTICE PURSUANT TO FED. R. BANKR. P. 2002(a)(3)**</u>

UP FIELDGATE US INVESTMENTS – FASHION SQUARE, LLC (the "Debtor"),

by and through undersigned counsel, hereby files this motion pursuant to 11 U.S.C. § 105(a) and

Rule 9019 of the Federal Rules of Bankruptcy Procedure for the entry of an order approving the

settlement agreement attached hereto as **Exhibit A** (the "Settlement Agreement" or

"Compromise"),[1] by and among the Debtor, **THE BANCORP BANK** ("Bancorp") and Mr.

Scott Fish, in addition to, Motion to Shorten Time for Notice Pursuant to Federal Rule of

Bankruptcy Procedure 2002(a)(3) (the "Motion"). In support of the Motion, the Debtor

respectfully represents as follows:

<u>**Relevant Factual and Procedural History**</u>

**A.  The Bancorp Loan**

1.     In February 2013, Debtor acquired the rights to own and redevelop the Orlando

Fashion Square Mall ("Fashion Square") utilizing a loan provided by Bancorp. At the February

2013 closing of Fashion Square, Debtor executed and delivered two promissory notes (the

_____
[1] A copy of the Settlement Agreement is attached as Exhibit A. In the event that there are any inconsistencies
between this Motion and the Settlement Agreement, the Settlement Agreement shall control.

"Notes") to Bancorp bearing an effective date of February 12, 2013, which were subsequently amended and restated on or about January 1, 2016 (the "Loan"), as evidenced by the documents attached to the Settlement Agreement as Exhibit 1 (collectively the "Loan Documents"). As of February 14, 2017, the aggregate outstanding principal and non-default interest due under the Notes was $43,000,801.22.

2.      The obligations of the Debtor under the Loan Documents are secured by liens on certain property in favor of Bancorp as described in the Loan Documents, which include, but are not limited to, Debtor's leasehold interests in real property that includes a retail shopping center located at 3201 East Colonial, Orlando, Florida 32803, commonly known as the "Fashion Square Mall" and the improvements and fixtures located thereon (the "Mall Parcel") and adjacent office building parcel and the improvements and fixtures located thereon at 3710 Maguire Blvd., Orlando, Florida 32803, where "Anthem College" was once a tenant (the "Anthem Parcel") (the Mall Parcel and Anthem Parcel are collectively referred to herein as the "Real Property"), the rents and leases derived therefrom (the "Rents"), as well as the personal property pledged as collateral in the Loan Documents (the Real Property and Rents are collectively referred to herein as the "FSM Collateral"). The current market value of the FSM Collateral is substantially below the amount due and owing under the Loan Documents.

3.      Mr. Scott Fish (the "Guarantor") guaranteed the Loan pursuant to that certain guaranty executed on or around February 12, 2013, as reaffirmed by Guarantor in his Joinder of Guarantor (the "Guaranty").

**B. The Foreclosure, Debtor's Bankruptcy Case and Settlement**

4.      On January 3, 2017, Bancorp filed an action in the United States District Court for the Middle District of Florida (the "District Court"), Case No. 6:17-CV-1-ORL-40-GJK, seeking

to foreclose the FSM Collateral, sue on the Notes, and sue Guarantor pursuant to his Guaranty (the "Foreclosure Case").

5.      On January 6, 2017 (the "Petition Date"), the Debtor filed with the United States Bankruptcy Court for the Middle District of Florida, Orlando Division its voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 case (the "Bankruptcy Case"). Since the Petition Date, the Debtor has continued to operate its business as a debtor-in-possession under §§ 1107(a) and 1108 of the Code (Doc. No. 6 – *Order Authorizing Debtor to Operate Business*).

6.      On January 17, 2017, Bancorp filed a motion pursuant to 11 U.S.C. §§ 362(d)(1) and  (d)(2) (the "Stay Relief Motion") seeking an order terminating or modifying the automatic stay to allow it to resume the Foreclosure Case. In addition, on January 24, 2017, Bancorp filed its motion to dismiss or convert the Debtor's Chapter 11 case (the "Dismissal Motion") (the Stay Relief Motion and Dismissal Motion are collectively referred to herein as the "Bancorp Motions"). The Bancorp Motions contend that Debtor filed its bankruptcy case in bad faith in an attempt to forestall Bancorp's foreclosure efforts, has grossly mismanaged estate property, and has no realistic prospect of reorganizing its debt. The Bankruptcy Court set a final evidentiary hearing on the Bancorp Motions for February 24, 2017.

7.      On January 27, 2017, Debtor filed an adversary complaint (the "Adversary Proceeding") against Bancorp, Betsy Cohen and Daniel Cohen in the Bankruptcy Court, Case No. 6:17-ap-00019-CCJ for claims including: (i) fraudulent misrepresentation; (ii) negligent misrepresentation; and (iii) equitable subordination of Bancorp's secured claim; (iv) breach of contract; (v) fraud in the inducement;  (vi) breach of implied covenant of good faith and fair dealing; (vii) negligent administration of loan agreements; (viii) unjust enrichment; and (ix) to

determine the extent, validity and priority of its mortgage lien (collectively referred to herein as the "Adversary Claims").

8.     On February 15, 2017, the Debtor, Bancorp and Guarantor (collectively referred to herein as the "Parties") agreed to resolve any and all disputes between them regarding the Loan, Loan Documents, FSM Collateral, the Foreclosure Case, the Bankruptcy Case, including the Bancorp Motions and the Adversary Claims. As discussed in this Motion, when the facts of this case are analyzed in conjunction with the *Justice Oaks* Factors (defined below), it is clear that the Compromise should be approved. The terms of the Compromise are reasonable, fair and equitable. Most importantly, the Compromise resolves a dispute between a Debtor operating a real estate business and its secured creditor, without expending any further resources of the parties and Court. As more fully set forth below, the Compromise should be approved.

### Summary of Compromise

9.     The material terms of the proposed Compromise are as follows:

a.     ***Conditions Precedent***: The effectiveness of the Settlement Agreement is conditioned upon (i) the execution by Bancorp, Guarantor, and Up Development Key West Holdings, LLC ("Key West Borrower," an affiliate of the Debtor), by February 15, 2017 of a written settlement agreement regarding those certain loans to the Key West Borrower originally made on or about March 12, 2012 (the "Key West Loan") and the bankruptcy case for the Key West Borrower, Case No: 6:17-bk-00088-CCJ, including a resolution of the motions to lift stay and motion to dismiss filed in that case (the "Key West Settlement Agreement"); (ii) entry by the Bankruptcy Court on or before February 22, 2017 of (1) an order approving this Settlement Agreement and the Key West Settlement Agreement (the "Settlement Order"); (2) an order terminating the automatic stay for the purposes of

implementing this Settlement Agreement (the "Lift Stay Order"); (3) an order dismissing the Debtor's Bankruptcy Case solely for purposes of implementing this Settlement Agreement and the Key West Settlement Agreement (the "Dismissal Order"); and (4) an order dismissing the Adversary Proceeding.

      b.    **Payments**: On the Effective Date,[2] or as otherwise provided in the Settlement Agreement, Guarantor shall remit the Initial Settlement Payment[3] to Bancorp to be used or applied by Bancorp in its sole discretion. The Initial Settlement Payment and, except to the extent paid in part from proceeds of the sale of the "TCW Property" (defined below) on which Bancorp has a valid lien the Additional Payment (defined below), shall not be paid by Debtor or otherwise emanate from any of Debtor's assets, including the FSM Collateral and "cash collateral" as defined under 11 U.S.C. § 363.

      c.    **Transfer of Collateral**: Debtor desires to sell to an affiliate of Trammell Crow Company ("TCW") a portion of the Real Property that includes the Anthem Parcel and portions of the Mall Parcel (hereinafter the "TCW Property"), in connection with a potential sale of other adjacent property in which Bancorp does not hold a lien (the "Non-Debtor Property"). Subject to the terms of the Settlement Agreement, Bancorp is willing to release its lien on the TCW Property solely and exclusively upon the closing of the sale of the TCW Property and Non-Borrower Property and the payment of $3,050,000.00, less credit for the Initial Settlement Payment (the "Release Price"), provided that both the payment of the Release Price and the closing on the sale of the TCW Property and Non-Borrower Property occur on or before 30 days after the Effective Date (the "TCW Closing Deadline"). In addition, Bancorp agrees that the portion of the Release Price necessary to satisfy the outstanding real estate taxes due on the Mall

---

[2] As defined in the Settlement Agreement at pg. 3, Section D(i).

[3] As defined in the Settlement Agreement at pg. 8, Section D(iv), but redacted in the filings with the Bankruptcy Court for competitive reasons.

Parcel for 2015, 2016 and the proration for 2017 (collectively the "Delinquent Mall Taxes") (excluding any other taxes that may be due or become due with respect to the TCW Property, which taxes shall not be paid by Bancorp) shall be delivered to the title or closing agent for the sale of the TCW Property who shall cause the Delinquent Mall Taxes to be paid. (collectively, all of the foregoing terms and conditions of this paragraph the "TCW Property Sale Conditions")

      d.      If the closing of the sale of the TCW Property and Non-Borrower Property do not occur on or before the TCW Closing Deadline, on the next business day after the TCW Closing Deadline, (1) Guarantor shall pay to Bancorp an additional sum (the "Additional Payment"), which shall be retained by Bancorp, not subject to setoff, recoupment or claim, to be used or applied by Bancorp as determined in its sole discretion, and (2) Debtor and Guarantor shall cause Debtor to execute and deliver to Bancorp (or its assignee) a deed and/or assignment in lieu of foreclosure instrument bill of sale, and any other documents required to be executed in connection therewith by the title insurance company, for the TCW Property (which will be turned over to Bancorp).

      e.      Immediately upon the entry of the Lift Stay Order and Settlement Order,[4] Debtor and Guarantor shall cause Debtor to execute and deliver to Bancorp (or its assignee) a deed and/or assignment in lieu of foreclosure instrument and bill of sale for the FSM Collateral less the TCW Property (the "Mall Related Collateral"). Debtor's transfer to Bancorp of all its right, title and interest in the FSM Collateral shall include and be transferred to Bancorp (but not be credited against the Initial Settlement Payment or Additional Payment), all cash and monies (1) owned by Debtor that are held by Debtor or any agent thereof or deposited in any account at any financial institution, including any debtor-in-possession accounts on the Effective Date less those amounts necessary to cover expenses incurred but not yet paid by Debtor as authorized by

---

[4] As such terms are defined in the Settlement Agreement at pgs. 4-5, Section D(i)(e).

the *First Interim Order Granting Debtor's Motion to Use Cash Collateral* (Doc. No. 20), *Second Interim Order Granting Debtor's Motion to Use Cash Collateral* (Doc. No. 42), and *Order Approving Payment of Premium Finance* (Doc. No. 63), or (2) collected thereafter to the extent funds are owing to Debtor as a result of ownership or operation of the FSM Collateral, including the right to collect any refunds or other payment intangibles, and Debtor and Guarantor shall account to Bancorp for the same and cause those funds to be delivered to Bancorp upon collection.

   f.  ***Possession, Control and Management***: On the earlier of the date Bancorp accepts the deed and/or assignment in lieu of foreclosure for the Mall Related Collateral (the "Transfer Date"), the date an order appointing receiver is entered in the Foreclosure Case, or the date the certificate of title is issued for the Mall Related Collateral, Debtor and Guarantor shall turnover to Bancorp and its designated management company or receiver the complete possession, control and management of the Mall Related Collateral.

   g.  ***Interim Actions:*** Between the execution of the Settlement Agreement and the Transfer Date, the date an order appointing a receiver is entered, or the date a certificate of title is issued for the Mall Related Collateral, whichever occurs first, Debtor and Guarantor agree to manage the Mall Related Collateral in a commercially reasonable manner subject to the terms of the *First Interim Order Granting Debtor's Motion to Use Cash Collateral* (Doc. No. 20), and *Second Interim Order Granting Debtor's Motion to Use Cash Collateral* (Doc. No. 42).

   h.  ***Costs***: Except for attorneys' fees and costs of the Debtor and Guarantor, Bancorp agrees to pay all reasonable and customary out-of-pocket costs of the transfer of property to Bancorp contemplated by the Settlement Agreement.

i.    ***Releases***: Mutual releases by and between Bancorp, Debtor, and Guarantor including their subsidiaries, affiliates, predecessors-in-interest, successors, assigns, current and former officers, agents, stockholders, members, partners, attorneys and employees from any and all claims, causes of action (including the Adversary Claims), suits debts, obligations, liabilities, demands losses, attorney's fees, costs, and expenses. The releases described in this paragraph are subject to certain exclusions and clawbacks as specified in the Settlement Agreement.

j.    ***Retention of Jurisdiction***: Upon entry of the Lift Stay Order, the District Court shall have jurisdiction with respect to any dispute under the Settlement Agreement. Once the Dismissal Order has been entered, the Bankruptcy Court shall have, and if it so chooses, may exercise for sixty (60) days after the Effective Date, jurisdiction with respect to any dispute pertaining to the Settlement Agreement; provided however, the District Court shall have sole jurisdiction regarding the claims in the Foreclosure Case.

10.    The summary of compromise contained in paragraph 9 above, is merely that, a summary, and does not contain all of the details and material terms agreed to by and between the Parties. Any person interested in the full settlement details should consult **Exhibit A**, attached hereto, which embodies the terms of the entire Compromise reached between the Parties.

## Bankruptcy Rule 9019(a) and Justice Oaks II, Ltd.

The terms of the Compromise meet the applicable legal standard for approval by this Court. "It is generally recognized that the law favors settlement of disputes over litigation for litigation sake." *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993). Bankruptcy Rule 9019(a) provides that on a motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.

When considering compromises or settlements for approval, the bankruptcy court is to "determine whether the proposed settlement is fair and equitable." *In re Air Safety Int'l, L.C.*, 336 B.R. 843, 852 (S.D. Fla. 2005). The Eleventh Circuit has set forth factors to assist bankruptcy courts in determining whether a settlement proposal meets the appropriate standard. *Id.* These factors are as follows: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. (the "**Justice Oaks Factors**"). *See Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990). Settlements or compromises should be approved unless they "fall below the lowest point in the range of reasonableness." *In re Bicoastal Corp.*, 164 B.R. at 1016.

Here the Justice Oaks Factors weigh in favor of approving the terms of the Settlement Agreement. After consideration of the probability of success, and the complexity, expense, inconvenience and delay attendant to litigating the Bancorp Motions and Adversary Claims (collectively referred to herein as the "Contested Matters"), the Parties believe that the Compromise is fair and equitable and in the paramount interests of the Debtor and its creditors. While the Parties dispute factual and legal issues relevant to the disposition of some or all of each other's claims, and, there, dispute the probability of success, the agreed-upon settlement is a fair compromise. Settlement at this juncture avoids the expense, inconvenience, uncertainty and delay that would be caused by litigating various matters in the Debtor's bankruptcy case. Furthermore, the Compromise provides for the prompt and efficient resolution of the Contested Matters and the Debtor's bankruptcy case.

**Probability of Success**. It is Bancorp's position that the Debtor filed its Chapter 11 petition for relief in bad faith and has little hope to survive in Chapter 11. Bancorp believes it has strong arguments for obtaining stay relief or dismissal of this case under 11 U.S.C. § 1112, while the Debtor believes it has the ability to confirm a Chapter 11 plan and that the Adversary Claims are well-founded and may result in recoveries for its estate. However, following extensive negotiations between the Parties that have taken into account each party's potentially meritorious claims and defenses, both Parties strongly believe the Compromise accurately incorporates both Parties' probability of success on the merits. Through the Compromise, the Parties have avoided the alternative to the Settlement Agreement which is burdensome and costly litigation that would consume valuable estate and court resources with little to no guaranty of success.

**Difficulties in Collection**. With respect to the difficulties of collection against Bancorp, the Debtor is not aware of Bancorp's financial condition or ability to respond to a judgment granting Debtor a monetary recovery. Notwithstanding the foregoing, the Debtor has avoided any risk associated with the potential collection issues against Bancorp by agreeing to the terms of this Compromise which resolves the Adversary Claims without expending valuable estate resources. Thus, after comparing the potential recovery to the estate, the attendant costs of litigation, and the uncertainty surrounding Bancorp's financial condition, Debtor submits that the resolution tendered by the Compromise provides a superior result for its estate.

**Complexity of Litigation, Inconvenience, and Delay**. The Compromise provides an efficient and expedient resolution to the Bancorp Motions and the Adversary Proceeding (collective the "Contested Matters"). In reaching this conclusion, the Parties have considered the costs of prosecuting and defending the Contested Matters. By reaching a compromise, the Parties are able to avoid the expenditure of significant resources in continuing to litigate the Contested

Matters, anticipated claims objections, anticipated disclosure statement objections and anticipated confirmation objections. After comparing the potential recovery to the estate with the attendant costs of litigation, the Debtor strongly believes the Compromise provides both Parties with a superior alternative to litigation of the Contested Matters.

**Paramount Interests of Creditors**. This Compromise was negotiated at arms-length and in good faith by informed counsel for the Debtor, Bancorp and Guarantor, and is in the best interest of creditors and parties-in-interest. In particular, the paramount interests of the Debtor's creditors are benefitted by the terms of the Compromise as the Debtor's resources are not being further expended on administering this Chapter 11 case and litigating various matters with Bancorp. Furthermore, the Compromise: (i) allows the Debtor to pursue the sale of the TCW Property; (ii) provides for the stabilization of operations at the Fashion Square Mall; (iii) cures many of the uncertainties created by the lingering disputes between the Parties; (iv) and provides a mechanism for the continued upkeep of the Real Property thereby preserving its market value for the benefit of the Debtor's estate, its creditors and the local community. In addition, because the Settlement Agreement calls for dismissal of Debtor's Bankruptcy Case, the rights of Debtor's other creditors will remain unaltered and as they existed prior to the Petition Date. Accordingly, the Debtor believes that the Compromise falls well within the range of reasonableness, is in the best interests of the Debtor's estate and its creditors and should be approved as a sound exercise of the Debtor's business judgment.

For the foregoing reasons, the Court should approve the Settlement Agreement as it: (a) meets the applicable legal standard for approval and (b) is fair, equitable and reasonable. In addition, in light of the exigencies surrounding the TCW Sale and the negative impact on

operations at Fashion Square created by the disputes between the Parties, Debtor submits that cause exists to shorten the notice period required by Fed. R. Bankr. P. 2002(a)(3).

**WHEREFORE**, based on the foregoing reasons and authorities, the Debtor respectfully requests that the Court enter an Order: (i) granting this Motion and approving the terms of the Settlement Agreement in its entirety; (ii) ordering the Parties to comply with the terms of the Settlement Agreement; (iii) retaining jurisdiction (to the extent specified in the Settlement Agreement): (a) over the terms of the Settlement Agreement and the parties thereto to enforce the order granting this Motion; and (b) to enforce the terms of the Settlement Agreement (to the extent provided in the Settlement Agreement); and (iv) granting such other relief as this Court deems proper.

Dated: February 15, 2017

/s/ R. Scott Shuker
R. Scott Shuker, Esq.
Florida Bar No. 984469
Daniel A. Velasquez, Esq.
Florida Bar No. 0098158
**Latham, Shuker, Eden & Beaudine, LLP**
111 N. Magnolia Ave., Suite 1400
Telephone: (407) 481-5800
Facsimile: (407) 481-5801
rshuker@lseblaw.com
dvelasquez@lseblaw.com
*Attorneys for Debtor*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:                                            CASE NO.: 6:17-bk-00088-CCJ

UP FIELDGATE US INVESTMENTS –                     CHAPTER 11
FASHION SQUARE, LLC

            Debtor.

_____/

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true copy of the **EMERGENCY MOTION FOR AN ORDER PURSUANT TO FED. R. BANKR. P. 9019 APPROVING THE SETTLEMENT AGREEMENT BY AND AMONG THE DEBTOR AND THE BANCORP BANK, IN ADDITION TO, MOTION TO SHORTEN TIME FOR NOTICE PURSUANT TO FED. R. BANKR. P. 2002(a)(3)**, together with any exhibits, , has been furnished either electronically to: Scott Fish, Managing Member, UP Fieldgate US Investments  Fashion Square, LLC, 3201 E. Colonial Drive, Orlando, Florida 32803; The Bancorp Bank, c/o Mark J. Wolfson, Esq., and Kevin A. Reck, Esq., Foley & Lardner LLP, 100 North Tampa Street, Suite 2700, Tampa, Florida 33602  5810, mwolfson@foley.com, kreck@foley.com; and all parties who receive electronic notice via CM/ECF in the ordinary course of business; and the U.S. Trustee, 400 W. Washington Street, Suite 1100, Orlando, Florida 32801; and on February 16, 2017 by U.S. First Class, postage prepaid mail to all creditors and parties-in-interest as shown on the matrix attached to original of this notice filed with the Court; or by Federal Express to any party not located in Central Florida.

                                      /s/ R. Scott Shuker
                                      R. Scott Shuker, Esq.

13

Label Matrix for local noticing
113A-6
Case 6:17-bk-00088-CCJ
Middle District of Florida
Orlando
Wed Feb 15 13:47:55 EST 2017

Scott D. Fish
Broad and Cassel
c/o Nicolette C Vilmos
390 N. Orange Ave., Ste. 1400
Orlando, FL 32801-1687

GMRI Inc
Bogin, Munns & Munns, PA
c/o L William Porter III
1000 Legion Place Suite 1000
Orlando, FL 32801-1025

Robert F Higgins
Lowndes, Drosdick, Doster, Kantor & Reed
POB 2809
Orlando, FL 32802-2809

MMM Lakewood, LLLP
c/o W. Glenn Jensen, Esq.
Roetzel & Andress, LPA
P.C. Box 6507
Orlando, FL 32802-6507

Orlando Utilities Commission
c/o Michael A. Paasch, Esq.
Mateer & Harbert, P.A.
P O Box 2854
Orlando, FL 32802-2854

Seritage SRC Finance, LLC
300 S Orange Ave Suite 1000
Orlando, FL 32801-5403

The Bancorp Bank
c/o Kevin A. Reck
Foley & Lardner LLP
111 N. Orange Avenue, Suite 1800
Orlando, FL 32801-2386

UP Fieldgate US Investments-Fashion Square,
3201 E Colonial Dr
Orlando, FL 32803-5140

AJ Masters Entertainment, LL
1610 Eagle Feather Drive
Kissimmee, FL 34746-4513

ATM USA
Attn: Brad Nesbit
2200 Gateway Centre Blvd, St
Morrisville, NC 27560-6218

Ahmad Elkhatib
c/o McBurger
114 Magnolia Park Trail
Sanford, FL 32773-7210

All Cell
Attn: Daniel Elias, VP/COO
4280 Church Street
Sanford, FL 32771-6924

Animal Rides, Inc
d/b/a LEDZ Shoes
3100 SW College Road
Ocala, FL 34474-7446

Auntie Anne's
Attn: President/Gen Mgr
1833 Westover Reserve Blvd
Windemere, FL 34786-6213

Bamboo Chi, Inc
d/b/a Home Spa
1531 Americana Blvd #13H
Orlando, FL 32839-8110

Bamboo Pillows
d/b/a Vape Shoppe
3100 SW College Road
Ocala, FL 34474-7446

Bao Hong LLC
Paris Nails & Spa
3201 E Colonial Dr
Orlando, FL 32803-5140

Barnie's Coffee & Tea Co
52 South Center Street
Ormond Beach, FL 32174-8463

Beshears & Associates
610 S Albany Ave
Tampa, FL 33606-2406

Beya
PO Box 8115
Santurce, PR 00910-0115

Blown Away
PO Box 618271
Orlando, FL 32861-8271

Bob's Speed and Sport Card
2307 - 124th Dr East
Parrish, FL 34219-6948

Brighthouse Networks
PO Box 31337
Tampa, FL 33631-3337

Brijan Enterprises, LLC
1501 Nestlewood Trail
Orlando, FL 32837-8006

CBS Mail Div
405 Lexington Avenue
New York, NY 10174-0002

CTM Group, Inc
Kiddie Rides #2)
9 Northeastern Blvd
Salem, NH 03079-1996

Candy Shop Boutique
PO Box 2445
Milford, CT 06460-0877

Charlotte Russe #43
5910 Pacific Center Blvd, St
San Diego, CA 92121-6302

China Breeze/He Chang, LLC
9833 Downey Cove Dr, F-07
Orlando, FL 32825-5516

Cintas
PO Box 630910
Cincinnati, OH 45263-0910

City of Orlando
78 W Central Ave
Orlrando, FL 32801-2457

Claire's Stores, Inc
Three Southwest 129th Ave
Pembrook Pines, FL 33027-1775

Coca Cola #2961499
1 Coca Cola Plz nW
Atlanta, GA 30313-2499

Coliseum of Comics
13305 Whisper Bay Drive
Clermont, FL 34711-5921

Cornerstone Apparel, Inc
Attn:  Mr. Tae Yi
5807 Smithway Street
Commerce, CA 90040-1605

Covelli Family Ltd
Partnership #3319
3900 Easst Market Street
Warren, OH 44484

D'Rachel's Boutique
3201 E Colonial Dr B-16
Orlando, FL 32803-5195

Delores Jewelry & Watch
Repair
14009 King Sago Ct
Orlando, FL 32828-9205

Detour Clothing Company
8024 Melrose Drive
Orlando, FL 32829

Dillard's Inc Store #227
PO Box 486
Little Rock, AR 72203-0486

Doo Kin
D&J Jewelry
164 Constitution Way
Winter Springs, FL 32708-6346

E & Y Ventures, LLC
7678 Persian Court
Orlando, FL 32819-4630

(c)EXPRESS #262 STRUCTURE
66 E SCHROCK RD PMB 275
WESTERVILLE OH  43081-2915

Express Lock Service
PO Box 530104
Orlando, FL 32853-0104

FF Maintenance
4224 Anson Lane, Unit 101
Orlando, FL 32814-6089

FIS Outdoor
300 Central Park Drive
Sanford, FL 32771-6671

FSM Maintenance
3201 E Colonial Dr
Orlando, FL 32803-5140

Fancy Nails
7822 Antibes
Orlando, FL 32825-5152

Fineman, Krekstein & Harris
Attn:  Michael Krekstein, Esq
BNY Mellon Center
1735 Market St, Ste 600
Philadelphia, PA 19103-7513

Florida Department of Revenue
Bankruptcy Unit
Post Office Box 6668
Tallahassee FL 32314-6668

Florida Dept of Revenue
Attn:  Executive Director
5050 W Tennessee St
Tallahassee, FL 32399-0140

Foot Locker Inc
PO Box 2943
Harrisburg, PA 17105-2943

Foto Fantasy Inc
Innovative Foto
8A Industrial Way
Salem, NH 03079

Frank Herring
521 Balmoral Road
Winter Park, FL 32789-5257

Fuji Express
9833 Downey Cove Dr
Orlando, FL 32825-5516

GMRI Inc
Olive Garden #0021002
PO Box 695012
Orlando, FL 32869-5012

GMRI, Inc
c/o L. William Porter III, Esquire
Bogin, Munns & Munns, PA
1000 Legion Place, Ste 1000
Orlando, FL 32801-1025

Gallery Shoes, LLC
12120 Diedra Court
Orlando, FL 32825-7429

Game Stop
625 Westport Parkway
Grapevine, TX 76051-6740

General Nutrition Center
300 Sicth Avenue, 4th Floor
Store #239
Pittsburgh, PA 15222

Gold & Silver Fashions
4 EverSky
11424 Center Lake
Windermere, FL 34786-5998

Graphix Unlimited &
Custom T-Shirts LLC
1105 Constantine Street
Orlando, FL 32825-5301

H & Q Jewelers
3201 E Colonial Drive
Orlando, FL 32803-5140

Hot Topic
18305 E San Jose Ave
City of Industry, CA 91748-1237

Hudson Air Conditioning
2700 Junction Road
Zellwood, FL 32798-5490

Ink Spot Tatoo
75 E Colonial Drive
Orlando, FL 32801-1221

Internal Revenue Service
Centralized Insolvency Ops
PO Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
Post Office Box 7346
Philadelphia PA 19101-7346

Internal Revenue Svc*
Spec Proc Function
PO Box 35045, Stop 5720
Jacksonville, FL 32202

JC Penney Property Mgmt
PO Box 10001 M/S 2104
Store 709
Dallas, TX 75031

Jimmy Jazz
85 Metro Way
Secaucus, NJ 07094-1905

Johnson Real Estate Law, PA
3660 Maguire Blvd
Orlando, FL 32803-3059

Journey's/Genesco
1415 Murfreesboro Rd
Ste #628 Store 1289
Nashville, TN 37217-2826

Kevin A Reck, Esq
Foley & Lardner LLP
a/f The Bancorp Bank
111 N Orange Ave, Ste 1800
Orlando, FL 32801-2343

Lids
1425 Murfreesboro Pike
Nashville, TN 37217

Lilly's Perfume Inc - Cart
10106 Garden Rose Ct
Orlando, FL 32825-7412

Lolo Beauty Group Inc
3201 E Colonial Dr #E-01
Orlando, FL 32803-5140

MMM Lakewood, LLLP
c/o W. Glenn Jensen/Mychal J Katz
Roetzel & Andress, LPA
P.O. Box 6507
Orlando, FL 32802-6507

MMM Lakewood, LLP
605 E Robinson St
Suite 620
Orlando, FL 32801-2046

Macy's Southeast #813
c/o Macy's Retail Hld RE
7 W 7th Street - 17th Floor
Cincinnati, OH 45202-2468

Madrag
5601 Westside Ave
North Bergen, NJ 07047-6453

Mark Wolfson, Esq
Foley & Lardner LLP
a/f The Bancorp Bank
100 N Tampa St, Ste 2700
Tampa, FL 33602-5810

Martin Roofing Services
2720 Forsyth Rd, Ste 200A
Winter Park, FL 32792-8212

Men's Choice-Milanos
6024 Melrose Drive
Orlando, FL 32829

Mike Atwood Excavating
PO Box 3307
Deland, FL 32721-3307

Mini Queen dba Kingz Anime
3640 Mt Vernon Way
Kissimme, FL 34741-7023

Murat Uygun
dba Fashion Cell Accesories
3577 Wilshire Way Rd
Orlando, FL 32829-7355

Murray Insurance Agency
195 Wekiva Springs Rd #100
Longwood, FL 32779-6089

Number 7 Inc/Sirens
50 Duff Law Road
Toronto, Ontario
CANADA  M6A 2W1

One Stop Shop
Apex Trading Co
10603 Rainbow Trout Court
Orlando, FL 32825-4875

Orange County Tax Collector
PO Box 545100
Orlando FL 32854-5100

Orange Cty Bd of
County Commissioners
Attn:  Ann Caswell
PO Box 1393
Orlando, FL 32802-1393

Orange Cty Tax Collector
Attn:  Scott Randolph
PO Box 545100
Orlando, FL 32854-5100

Orlando Utilities Commission
P O Box 3193
Orlando  FL 32802-3193

Orlando Utilities Commission
PO Box 31329
Tampa, FL 33631-3329

Orlando Utilities Commission
c/o Michael A Paasch
225 East Robinson St Ste 600
P O Box 2854
Orlando FL  32802-2854

Pacsun #0343
PO Box 68042
Anaheim, CA 92817-0842

Paint, Sip & Swirl Inc
1101 Terrace Blvd
Orlando, FL 32803

Payless Shoesource Inc
Sstore #4025
PO Box 3560
Topeka, KS 66601-3560

Pearl Eyelab Express/
Luxottica
Attn: Lease Admin #006511
PO Box 8508
Mason, OH 45040-7113

Perfect Brow Art
Attn:  E Proikos-Gorgees
3223 Lake Avenue #15C
Wilmette, IL 60091-1069

Pete's Karate
2048 Kensington Run Drive
Orlando, FL 32828-7807

Pizza De Milan Inc
3201 E Colonial Dr #F-04
Orlando, FL 32803-5167

Premier Cinema Corp
Attn:  Gary Moore, Pres
600 Avondale Drive
Big Springs, TX 79720-6510

Producing LLC
4419 Fox Street
Orlando, FL 32814-6068

Rack Room Shoes, Inc
Attn:  Lease Admin
8310 Technology Drive
Charlotte, NC 28262-0301

Red LipsDosmetics
dba Next Trend Prod
3621 Colonial Rd #712
Orlando, FL 32803

Reliance Plumbing
PO Box 568035
Orlando, FL 32856-8035

Robert Trotman
2045 Shroud Street #205
Orlando, FL 32814-6912

Roberts & Roberts Mgmt Svcs
Attn:  Samuel Roberts
1969 S Alafaya Trail #133
Orlando, FL 32828-8732

SCHINDLER ELEVATOR CORPORATION
1530 TIMBERWOLF DR
HOLLAND OH 43528-9161

SRV LLC/Calendar Hlds LLC
6411 Burleson Rd
Austin, TX 78744-1414

Sam's Watch & Jewelry Repair
3247 E Colonial Dr #D-70
Orlando, FL 32803-5109

Schindler Elevator Corp
PO Box 93050
Chicago, IL 60673-3050

Schmid Construction
1655 East Highway 50
Clermont, FL 34711-5056

Scott D. Fish
c/o Nicolette C. Vilmos, Esquire
Broad and Cassel
390 N. Orange Ave., Ste. 1400
Orlando, FL 32801-1687

Scott Fish
c/o UP Fieldgate US Investments-
Fashion Square LLC
3201 E Colonial Dr.
Orlando, FL 32803-5198

Sears
12670 Collection Drive
Chicago, IL 60693-0001

Sears
Attn: Stephanie Baker
3333 Beverly Rd BC-131A
Hoffman Estates, IL 60179-1999

Seritage SRC Finance, LLC
489 Fifth Avenue, 18th Floor
New York, NY 10017-6127

Seritage SRC Finance, LLC
c/o Andrew M. Brumby, Esq.
Shutts & Bowen LLP
300 S. Orange Avenue, Suite 1000
Orlando, FL 32801-5403

Sharky's Amusements LLC
PO Box 4213
Deland, FL 32721-4213

Silver Mine-4 Ever Sky
11424 Center Lake
Windermere, FL 34786-5998

Sloane & Johnson, PLLC
3660 Maguire Blvd, Ste 102
Orlando, FL 32803-3059

Smarte Carte-Strollers
4455 White Bear Pkwy
St Paul, MN 55110-7641

Spencer Gifts Inc
6826 Black Horse Pike
Egg Harbor Twnship, NJ 08234-4297

Spring Communications Inc
155 N 400 West, Ste 300
Salt Lake City, UT 84103-1132

Sprint Store by Arch-4G
Mobility LLC
Attn: A Ghal & S Sachdeva
1940 W Corporate Way
Aneheim, CA 92801-5373

Sterling Inc/Kay
Real Estate Dept
375 Ghent Road
Akron, OH 44333-4601

Strikeouts
3201 E Colonial Dr
Orlando, FL 32803-5140

Subway #18417
2277 Lee Road
Winter Park, FL 32789-1887

Sun N' Fun Vending Inc
532 Spring Lake Circle
Tarpon Springs, FL 34688-4971

Sunglass Hut/Luxottica
Attn: Lease Admin #4501
PO Box 8508
Mason, OH 45040-7113

Sunshine Fitness Fashion
Square, LLC
4776 New Broad St. Ste. 195
Orlando, FL 32814-6423

Sunshine School Uniform
and Supply Co
16345 NW 57th Ave
Miami Lakes, FL 33014-6116

(p)C O AMERICAN INFOSOURCE LP
4515 N SANTA FE AVE
OKLAHOMA CITY OK 73118-7901

TECO
PO Box 31017
Tampa, FL 33631-3017

The Bancorp Bank
1818 Market Street
Philadelphia, PA 19103-3628

The Bancorp Bank
Attn: Betsy Z. Cohen
409 Silverside Road
Wilmington, DE 19809-1771

The Bancorp Bank
c/o Kevin A Reck
111 N Orange Avenue Ste 1800
Orlando FL 32801-2343

The Finish Line
3308 N Mitthoefer Rd
Indianapolis, IN 46235-2332

The Orlando Party Shuttle In
1076 Chesterfield Circle
Winter Springs, FL 32708-4709

Things Remembered #167
5500 Avion Park Drive
Highland Heights, OH 44143-1992

Torrid
18305 San Jose Ave
Attn: Pres/Gen Mgr
City of Industry, CA 91748-1237

Tradelinks USA Inc
TeamSports-Sportz
6220 Meredith Erin Lane
Orlando, FL 32819-7768

Traffic Shoes
Goodman & Dominquez Inc
10701 NW 127th Street
Medley, FL 33178-3198

Vans #237
2 North 20th Street
Suite 1700
Birmingham, AL 35203-4015

Venator Group Rertail Inc
dba Champs
PO Box 2943
Haarrisburg, PA 17105-2943

Verona Collection LLC
8208 Baja Blvd
Orlando, FL 32817-2483

Wragg & Casas
Public Relations Inc
1221 Brickell Ave, Ste 730
Miami, FL 33131-3260

Zale Corp
Store 957/Totally Pagoda
PO Box 152777
Irving, TX 75015-2777

Andrew M Brumby +
Shutts & Bowen LLP
300 South Orange Avenue, Suite 1000
Orlando, FL 32801-5403


Robert F Higgins +
Lowndes, Drosdick, Doster, Kantor & Reed
215 North Eola Drive
Orlando, FL 32801-2095

Michael A Paasch +
Mateer & Harbert PA
Post Office Box 2854
Orlando, FL 32802-2854

R Scott Shuker +
Latham Shuker Eden & Beaudine LLP
Post Office Box 3353
Orlando, FL 32802-3353


Mark J. Wolfson +
Foley & Lardner
100 North Tampa Street, Suite 2700
PO Box 3391
Tampa, FL 33601-3391

United States Trustee - ORL +
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801-2210

Elena L Escamilla +
Office of the United States Trustee
400 W. Washington Street
Suite 1100
Orlando, FL 32801-2440


Kevin A Reck +
Foley & Lardner
111 North Orange Avenue
Suite 1800
Orlando, FL 32801-2386

Nicolette Corso Vilmos +
Broad and Cassel
390 North Orange Avenue
Suite 1400
Orlando, FL 32801-1687

L William Porter III+
Bogin, Munns & Munns, P.A.
1000 Legion Place, Suite 1000
Orlando, FL 32801-1025


Mychal J Katz +
Roetzel & Andress LPA
Post Office Box 6507
Orlando, FL 32802-6507

Daniel A Velasquez +
Latham Shuker Eden Beaudine LLP
111 N. Magnolia Avenue
Suite 400
Orlando, FL 32801-2314

Note: Entries with a '+' at the end of the
name have an email address on file in CMECF


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


T Mobile
Attn:  Nat'l Lease Complianc
12920 SE 38th Street
Bellevue, WA 98006


Addresses marked (c) above for the following entity/entities were corrected
as required by the USPS Locatable Address Conversion System (LACS).


Express #262 Structure
52 Westerville Sq Shopping
PMB #275
Westerville, OH 43081


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Cynthia C. Jackson +
Orlando

End of Label Matrix
Mailable recipients    164
Bypassed recipients      1
Total                  165

## Settlement Agreement- Fashion Square Mall

UP – Fieldgate US Investments–Fashion Square, LLC, a Florida limited liability company ("Borrower") and Scott Fish, individually ("Guarantor") and The Bancorp Bank, a Delaware charted banking corporation (the "Lender") have entered into this Settlement Agreement (the "Agreement") on this 15th day of February 2017.[1]  Borrower and Guarantor (collectively, the "Obligors") and Lender agree as follows:

## RECITALS

A. **Loan:**

Lender provided certain advances to Borrower on or about February 12, 2013, pursuant to various documents, as amended and restated on or about January 1, 2016 (the "Loan"), as evidenced by the documents described in **Exhibit 1** attached hereto (collectively, the "Loan Documents").

The obligations of Borrower under the Loan Documents are secured by liens on certain property in favor of Lender as described in the Loan Documents, which include, but are not limited to, Borrower's leasehold interests in real property that includes a retail shopping center located in Orlando, Florida, located at 3201 East Colonial, Orlando, Florida 32803, commonly known as the "Fashion Square Mall" and the improvements and fixtures located thereon (the "Mall Parcel") and adjacent office building parcel and the improvements and fixtures located thereon located at 3710 Maguire Blvd, Orlando, Florida 32803, where "Anthem College" was a tenant (the "Anthem Parcel") (collectively, the "Real Property"), the rents and leases derived thereof (the "Rents"), as well as the personal property pledged as collateral in the Loan Documents (together with the Real Property and the Rents, collectively, the "FSM Collateral"), including the property described in **Exhibit 2** attached hereto.  The FSM Collateral also includes the rights granted to Lender in the First Interim Order Granting Debtor's Motion to Use Cash Collateral, Second Interim Order Granting Debtor's Motion to Use Cash Collateral, and Interim Order on The Bancorp's Bank's Motion for Relief from the Automatic entered in the Bankruptcy Case, regardless of the entry of the Lift Stay Order or Dismissal Order.

Guarantor guaranteed the Loan pursuant to that certain Guaranty executed on or about February 12, 2013, as reaffirmed by Guarantor in his Joinder of Guarantor (the "Guaranty").  The Guaranty is secured by Guarantor's pledge to Lender of his uncertificated membership interest in Borrower and other rights set forth in that certain Membership Interest Pledge Agreement dated December 11, 2013 (the "Membership Interest Pledge").  Lender's rights and interest under the Membership Interest Pledge is

---

[1] As used herein, the term "Guarantor" is used solely to create a defined term and includes Scott Fish as a guarantor, manager, or owner of Borrower and as a borrower, co-borrower, or guarantor of any other debtor-creditor relationship with or as a banking customer of Lender.  Capitalized terms not otherwise defined herein shall have the meaning as ascribed  under the Loan Documents, other than with respect to designations from the official docket of the Bankruptcy Case, which refer to the motion or order as applicable.

**EXHIBIT A**

perfected pursuant to that certain UCC-1 Financing Statement filed with the Tennessee Secretary of State on December 12, 2013 (together, the "Pledge Documents").

## B.    Defaults:

One or more Events of Default have occurred under the Loan Documents, due to, among other things, non-payment of a principal payment, monthly installment payments, and 2015 real estate taxes, with each constituting a separate and independent Event of Default (collectively the "Payment Defaults") resulting in the Loan being accelerated and due in full; provided however, Obligors' acknowledgment of the Payment Defaults shall not be effective until the Effective Date.

As of February 13, 2017, the aggregate outstanding principal amount due was $41,905,156.32 and the aggregate non-default interest due under Note A ($4,245.73 per diem) and Note B ($701.41 per diem) was $657,969.62, and the aggregate incremental default interest from February 14, 2017 due under Note A ($1,997.99 per diem) and Note B ($330.07 diem) is $437,675.28, for a total of **$43,000,801.22**, plus additional interest and other charges permitted under the Loan Documents, taxes, and attorneys' fees and expenses incurred by Lender recoverable under the Loan Documents are due and owing as well (collectively, the "Amounts Due").

## C.    Litigation, Bankruptcy, and Agreement to Settlement:

(i)    On January 3, 2017, Lender filed an action in the United States District Court for the Middle District of Florida (the "District Court"), Case No. 6:17-CV-1-ORL-40-GJK, seeking to foreclose the FSM Collateral, sue on Note A and Note B, and sue Guarantor under his Guaranty (the "District Court Case"). Before commencement of the District Court Case, Lender notified certain tenants at the Fashion Square Mall to pay all rents otherwise due Borrower to Lender pursuant to its rights under the Loan Documents (including the collateral assignment of rents).

(ii)    On January 6, 2017, Borrower filed a chapter 11 petition (Doc. #1) in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), Case No. 6:17-BK-00090-CCJ (the "Bankruptcy Case"). Contemporaneous with the filing of the Bankruptcy Case, Borrower filed various first day motions, including, but not limited to the Emergency Motion of the Debtor-in-Possession For Authority to Use Cash Collateral (the "CC Motion") (Doc #3). Lender filed objections to the CC Motion, amongst other objections of record.

(iii)    On January 17, 2017, Lender filed The Bancorp Bank's Motion For Relief from the Automatic Stay (Doc. #30) (the "Stay Motion).

(iv)    On January 24, 2017, Lender filed The Bancorp Bank's Motion to Dismiss for Bad Faith or, in the Alternative, to Convert the Bankruptcy (the "Dismissal Motion") (Doc. #38).

2

(v)     Other than the allegation regarding the value of the FSM Collateral, Borrower objects to the allegations in the CC Motion, Stay Motion, and Dismissal Motion, including the allegations that Borrower filed the Bankruptcy Case in "bad faith" or its management engaged in mismanagement or other improper conduct.

(vi)    On January 12, 2017, the Bankruptcy Court entered the First Interim Order Granting Debtor's Motion to Use Cash Collateral (Doc. #12) and on January 26, 2017 Second Interim Order Granting Debtor's Motion to Use Cash Collateral (Doc. #42).

(vii)   On January 27, 2017, Borrower filed an adversary proceeding against Lender and Betsy Cohen and Daniel Cohen (the "Cohens") in the Bankruptcy Court, Case No. 6:17-ap-00019-CCJ (the "Adv. Pro."). The allegations raised in the Adv. Pro. are denied.

(viii)  On February 7, 2017, the Bankruptcy Court entered the Interim Order on The Bancorp's Bank's Motion for Relief from the Automatic Stay (Doc. #59).

(ix)    Obligors have acknowledged in the Bankruptcy Case that the market value of the FSM Collateral is substantially below the Amount Dues under the Loan Documents.

(x)     Lender on the one hand and Obligors on the other hand have agreed to resolve any disputes between them regarding the Loan, Loan Documents, FSM Collateral, the District Court Case, the Bankruptcy Case, including the Stay Motion and Dismissal Motion, CC Motion, and the Adv. Pro., as provided below.  The parties agree the above Recitals are incorporated below.

## D.   <u>Settlement Terms:</u>

For valuable consideration, the sufficiency of which is acknowledged, and subject in all respects to the conditions and terms as provided for herein, Obligors and Lender agree as follows:

(i)     <u>**Conditions Precedent:**</u>   The effectiveness of this Agreement shall occur on the day (the "Effective Date") when each and every of the following conditions precedent in this section have occurred:.

(a) the execution by Lender and Obligors of this Agreement on or before February 15, 2017, by 1:00 p.m., unless such deadline is otherwise extended by written agreement by Lender and Obligors;

(b) the execution of a written settlement agreement regarding (i) those certain loans by Lender to UP Development Key West Holdings, LLC (the "Key West Borrower, originally made on or about March 12, 2012 (the "Key West Loan"), executed by Lender, Key West Borrower and Guarantor on or before February 15, 2017, by 12:00 p.m.(unless such deadline is otherwise extended by written agreement by Lender and Obligors), and (ii) the bankruptcy case for the Key West Borrower, Case No. 6:17-BK-00088-CCJ, United States Bankruptcy Court for the Middle District of Florida, including resolution of the motions to lift stay and motion to dismiss filed in that case, all on terms and conditions acceptable to Lender (the "Key West Settlement Agreement");

(c) delivery of the "Initial Settlement Payment" as described below; provided, however, the failure of Obligors to cause the Initial Settlement Payment to be delivered as required herein after the entry of the Settlement Order shall not prevent this Agreement from being effective upon Lender filing by February 24, 2017, a Notice of Effectiveness with the Bankruptcy Court, and Lender shall be entitled to enforce its rights against Obligors under this Agreement, including Section D.(xi) below; otherwise, this Agreement shall not be effective and the Bankruptcy Court shall immediately re-schedule the final hearings on all pending motions in the Bankruptcy Case.

(d) filing by Borrower on or before February 15, 2017 (unless such deadline is otherwise extended by written agreement by Lender and Obligors) in the Bankruptcy Case of a motion to approve the Settlement Agreement, with dollars amounts to be paid by Guarantor redacted or filed under seal in the copy filed with the Bankruptcy Court for competitive reasons to the extent permitted by law (the "Settlement Motion") and a motion to shorten time for notice and hearing, and entry of an order by the Bankruptcy Court setting a hearing on the Settlement Motion for a date on or before February 21, 2017, unless the Hearing Date is continued by written consent of Lender and Obligors (the "Hearing Date");.

(e) entry by the Bankruptcy Court on or before February 22, 2017 (unless extended by written agreement of Lender and Obligors) of: (1) orders in the form acceptable to Lender and Obligors, which are not stayed, approving this Agreement and the Key West Settlement Agreement (including granting relief from the automatic stay), that is not stayed immediately terminating the automatic stay with respect to the Key West Borrower, and the attendant collateral as provided for under the Key West Settlement Agreement) pursuant to Rule 9019, Federal Rules of Bankruptcy Procedure (the

4

"Settlement Order"), (2) an order in the form acceptable to Lender and Obligors, which is not stayed, immediately terminating the automatic stay solely for the purposes of implementing this Agreement (the "Lift Stay Order") as to Lender and the FSM Collateral, including a provision waiving the provisions of Rule 4001(a)(3), Federal Rules of Bankruptcy Procedure, and (3) an order in the form acceptable to Lender and Obligors dismissing the Bankruptcy Case solely for the purposes of implementing this Agreement (but as permitted by 11 U.S.C. §349, expressly not affecting this Agreement, the Key West Agreement, or the terms thereof) with prejudice and, without the right to refile a bankruptcy petition for 180 days after title to the FSM Collateral is transferred to Lender or its assignee or a successful bidder by the recording of a deed/assignment-in-lieu of foreclosure or Certificate of Title, as applicable ("Dismissal Order"); provided however, this restriction shall not apply if Lender materially breaches its obligations under this Agreement which impairs Borrower's ability to comply with its obligations under this Agreement.  Among other terms, the Lift Stay Order and Dismissal Order shall state that any allegations asserting "bad faith" or "mismanagement" or the like are withdrawn and that the Dismissal Motion and Stay Motion are granted solely for purposes of implementing this Agreement and the Settlement Order.  The timing of the entry of the Dismissal Order shall not affect the immediate effectiveness of the Lift Stay Order or Settlement Order.  Lender may waive the condition of the entry of the Dismissal Order in its sole discretion by delivery to Borrower of a written notice, in which case the failure of the Bankruptcy Court to enter the Dismissal Order shall not affect the enforceability of this Agreement, Lift Stay Order, or Settlement Order;

(f) immediately prior to the entry of the Settlement Order, filing by Lender in the Bankruptcy Case of an Amendment to the Stay Motion and Amendment to the Dismissal Motion that states "Lender is withdrawing any allegations that Borrower filed the Bankruptcy Case in "bad faith" or its management engaged in mismanagement or other improper conduct."

(g) the immediate abatement of the Adv. Pro. and the entry by the Bankruptcy Court on or before February 22, 2017 (unless extended by written agreement of Lender and Obligors) of an order of dismissal with prejudice of the Adv. Pro., with the parties bearing their own fees and costs;

(h) there otherwise being no injunction or stay in effect precluding Obligors and Key West Borrower from executing their obligations

under this Agreement or the Key West Agreement, as applicable;

(i)  Guarantor represents to Lender that the following entities, in addition to Borrower, constitute, all the entities which have or had any creditor-debtor, depositor, contractual or other relationship with Lender, including but not limited to those relating to the Loan or FSM Collateral (a "Business Relationship"):  Key West Borrower, Up Development- Key West, LLC, UP Millenia Expo, LLC, HM-UP Development Alafaya Trail-Tru LLC, Up Development Corporate Park Office Building, LLC ("Corporate Park Office"), UP Strikeout, LLC, Fishman's Seafood, LLC, FSM Security, LLC, FSM Maintenance, LLC, UP Development Company LLC, UP Strike Out, LLC, UP Management – Fashion Square, LLC, and UP Development Tennessee, LLC (collectively, the "Fish Entities").

Guarantor shall, no later than the Effective Date, cause the Fish Entities and any other any entity in which Scott Fish is or has been an equity owner, manager, general partner, insider, affiliate, officer, or director that has or had any Business Relationship with Lender ("Other Fish Entities") to execute and deliver to Lender (i) one or more releases in favor of Lender Parties, containing substantially the release language described in Section D.(xxi) below and also releasing anything relating to any of the Fish Entities, Other Fish Entities, and Business Relationship, (2) as well as an acknowledgement that they have no claim against any of the FSM Collateral;

(j)  Guarantor causing by no later than the Effective Date one or more releases in favor of Lender Parties containing release language described in Section D.(xxi) below and also releasing anything relating to any of the Fish Entities, Other Fish Entities, and Business Relationship, to be executed and delivered to Lender by Joseph Fish, Eli Eden, Woody Trotman, and Frank Herring ("Fish Associates"), as well as a written acknowledgement that neither they nor any entity in which they are an equity owner have any claims against Lender or any of the FSM Collateral;

(k)  Guarantor causing by no later than the Effective Date the Acknowledgment, in the form attached hereto as **Exhibit 3**, by Guarantor, his spouse and UP Development Tennessee, LLC to be executed and delivered to Lender regarding those certain other loans (e.g., the aircraft and Tennessee residence) from Lender where they are the makers or guarantors of the subject promissory notes (the "Remaining Loans"), which states that Linda Fish has no equity or other interest in the Fish Entitles,  that the Remaining Loans are not affected by this Agreement or the Key West

Agreement, that states Guarantor, Linda Fish and UP Development Tennessee, LLC waive and release any claims against the "Lender Parties" (defined below) regarding the Remaining Loans, and the Remaining Loans remain in full force and effect; and Lender shall acknowledge therein that as of the Effective Date there no defaults under the terms of the loan documents for the Remaining Loans;

(l) Effective on the Effective Date, Obligors acknowledge that they shall be deemed to have been served with the complaint filed by Lender in the District Court Case and that the District Court has jurisdiction over them and the causes of action asserted therein, and they agree that their counsel shall file in the District Court Case on the Effective Date an acknowledgment in the form acceptable to Lender's counsel to that effect. Provided Obligors perform their obligations under this Agreement to pay to Lender the Initial Settlement Payment and Additional Payment and to execute and submit to Lender the Mall Related Collateral Transfer Documents, and if the TCW Property has not been transferred to TCW, the TCW Property Transfer Documents, Lender shall promptly dismiss in the District Court Case the guaranty cause of action against Guarantor (with the parties each bearing their own fees and costs) although said dismissal shall be without prejudice as to the "Limited Clawback" to the extent expressly permitted in this Agreement; and

(m) Provided that reciprocal releases have been provided in favor of the Lender, as provided above, Lender shall, no later than the Effective Date, execute and deliver to Obligors one or more releases in favor of the Fish Entities, Other Fish Entities and Fish Associates in substantially the same form as the release from the aforesaid to Lender required above in section D.(i)(i), except that said release shall not release anything excluded as to Obligors or otherwise affect the provisions of the "Limited Clawback" stated in Section D.(xxi)(b) and (c) below.

(ii) **Ratification:** Subject to the Effective Date occurring, Obligors acknowledge, reaffirm, and ratify the Loan, Loan Documents, and Guaranty, including any and all obligations arising under such Loan and the validity, extent and first consensual priority lien of Lender in the FSM Collateral, as modified by this Agreement. The Loan, Loan Documents, and Guaranty are not subject to defense, offset or counterclaim of any and all kinds upon the effectiveness of the release to Obligors provided for in Section D.(xxi) below.

(iii) **Financials and Reporting Requirements:** Borrower agrees to deliver to Lender, until Lender or its assigns (Lender intends to assign its rights

7

4820-0476-8579.7

to wholly-owned special purpose entity) accepts and records the deed/and or assignment in lieu of foreclosure for the "Mall Related Collateral" or the entry of the order appointing a receiver for the same as permitted herein, whichever first occurs, such documents and information as required by the First Interim Order Granting Debtor's Motion to Use Cash Collateral and Second Interim Order Granting Debtor's Motion to Use Cash Collateral, notwithstanding the entry of the Lift Stay Order or Dismissal Order when due thereunder; provided, however, once the Bankruptcy Case is dismissed Borrower is not required to prepare or submit the monthly reports required by the Office of the United States Trustee or a reconciliation regarding any rent that may be due to Borrower from any tenants or vice versa of the Mall Parcel; however, Obligors shall, upon request, reasonably cooperate and provide reasonable access to all of Borrower's books and records as is necessary for Lender or its successors in interest or assigns to fully understand the financial operations of the Mall Parcel, including determination of any reconciliations required by any tenant leases.

(iv)     **Payments:** On the Effective Date, or if the Lift Stay and Settlement Order are not entered before 1:00 p.m. on the Effective Date, then on the next business day after the Effective Date before 11:00 a.m. (Orlando time), Guarantor shall deliver by wire transfer to Lender, pursuant to wire instructions as designated by Lender, the non-refundable sum of████████████ not subject to setoff, recoupment or claim (the "Initial Settlement Payment"), to be used or applied by Lender as determined by Lender in its sole discretion. The Initial Settlement Payment and, except to the extent paid in part from proceeds of the sale of the "TCW Property" (defined below) on which Lender has a valid lien, the Additional Payment, shall not be paid by Borrower or otherwise emanate from any of Borrower's assets, including the FSM Collateral and "cash collateral" as defined under 11 U.S.C. §363.

Obligors waive any conflicts of interest or objections to the extent Foley & Lardner LLP acts as the escrow agent for any payment made under this Agreement and also representing Lender in connection with this Agreement or any matters pertaining to this Agreement, Obligors, the Loans or Loan Documents, or FSM Collateral. Obligors and Lender agree to indemnify and hold harmless Foley & Lardner LLP and its partners and employees from any damages, including attorneys' fees and costs, arising in any way in connection with its role as escrow agent for the Initial Settlement Payment or any other sums delivered to the escrow account in connection with this Agreement, excluding only intentional misconduct or gross negligence on the part of the firm.

8

(v)    **Transfer of Collateral:**

Obligors have agreed to cause to be transferred to Lender as provided in this Agreement the "Mall Related Collateral" and, if not transferred to "TCW" as provided herein, the "TCW Property" (as those terms are defined below). Anything herein to the contrary notwithstanding, that part of the TCW Property owned by Corporate Office Park is not being transferred to Lender.

In addition, Borrower has identified in its Bankruptcy Schedules parties to executory contracts. Any time on or after the Effective Date, upon written request of Lender, Obligors shall cause Borrower, to assign to Lender in one or more assignment documents acceptable to Lender, all of their right, title and interest in all of Borrower's right, title and interest in any such executory contracts related to the Mall Parcel that are identified in writing by Lender; provided, however, Lender in its sole discretion may exclude any particular executory contract. Lender is not agreeing to assume any obligations under any of these executory contacts, absent Lender's express agreement to do so pursuant to a separate written document.

Any time on or after the Effective Date, upon written request of Lender, Obligors shall cause UP Strikeout, LLC and any other entity in which Guarantor holds an equity interest that is a tenant or subtenant or vendor on the Mall Parcel to assign to Lender in one or more assignment documents acceptable to Lender all of their right, title and interest in any lease or sublease identified in writing by Lender, including the sublease with GSMG Entertainment, LLC relating to the bowling alley on the Mall Parcel (the "Bowling Alley Sublease"), provided, however, Lender in its sole discretion may exclude any particular sublease or vendor arrangement, and in all events Lender is not agreeing to assume any obligations under the Bowling Alley Sublease or any other sublease or vendor arrangement, absent Lender's express agreement to do so pursuant to a separate written document. Anything herein to the contrary notwithstanding, neither Borrower nor UP Strike Out, LLC is released from any obligations under the Bowling Alley Sublease.

Neither the provisions of this section nor the implementation thereof shall impair any superior right of Lender under the Loan Documents as to any lease, arrangement, or agreement covered by this section.

One or more Obligors or their affiliates have ownership, possession or control over certain vehicles under lease agreements (the "Vehicle Leases") with Lender as described on **Exhibit 4** attached hereto (the "Vehicles"). Guarantor, who is a guarantor on the Vehicle Leases desires to retain the same, and acknowledges that he remains personally liable for the obligations pertaining to those Vehicles under the terms of the applicable leasing agreements. In addition, notwithstanding

9

anything contained herein, in no event shall the within Agreement effect any of the rights and obligations under the Vehicle Leases, including with respect to the Obligors hereunder.

**Transfer Requirements and Procedures for Collateral:**

Commencing immediately after execution of this Agreement, at its expense, to the extent not already provided, Borrower shall deliver to Lender any other information and documents relating to any obligations of Obligors to third parties with respect to the FSM Collateral, the operation of the FSM Collateral, or otherwise related to the FSM Collateral, as may be requested by Lender, including copies of leases with amendments, surveys, plans and specification, warranties, lawsuits, contracts, and permits, which information and documents shall be provided to the satisfaction of Lender. At its cost, Borrower may in lieu of providing copies of the documents described in this paragraph, provide Lender access to shared drive or other secure web-based application to which Lender has free access to for 365 days after the execution of this Agreement. Borrower further agrees that, upon request, it shall make original documents relating to the FSM Collateral available to Lender for inspection in Orlando, Florida, upon reasonable written notice from Lender. Borrower desires to sell to an affiliate of Trammell Crow Company ("TCW") a portion of the Real Property that includes the Anthem Parcel and portions of the Mall Parcel, as generally shown on the sketch attached as **Exhibit 5 hereto**, as will be more particularly described a legal description and survey acceptable to Lender hereto (the "TCW Property"), in connection with a potential sale of other adjacent property in which Lender does not hold a lien (the "Non-Borrower Property"). Subject to the terms of this Agreement, Lender is willing to release its lien on the TCW Property solely and exclusively upon the closing of the sale of the TCW Property and Non-Borrower Property (which shall expressly be subject to the terms as provided for in this Paragraph) and the payment of $3,050,000.00, less credit for the Initial Settlement Payment, for a net payment of ███████████ (the "Release Price") which payment shall be retained by the Lender and provided that both the payment of the Release Price and the closing on the sale of the TCW Property and Non-Borrower Property must occur on or before 30 days after the Effective Date (the "TCW Closing Deadline"). In addition, notwithstanding anything contained herein, Lender agrees that the portion of the Release Price necessary to satisfy the outstanding real estate taxes due on the Mall Parcel for 2015, 2016, and the proration for 2017 (the "Delinquent Mall Taxes") (but expressly excluding any other taxes that may be due or become due including with respect to the TCW Property, which taxes shall not be paid by Lender) shall be delivered to the title or closing agent for the sale of the TCW Property who shall cause the outstanding

10

taxes for the Mall Parcel to be paid (collectively, all of the foregoing terms and conditions under this Paragraph, the "TCW Property Sale Conditions"). The payment of the Release Price shall be paid to Lender and shall not be subject to setoff, recoupment or claim, and applied by Lender in its sole discretion to the Amounts Due under the Loan Documents except as expressly provided above regarding the Delinquent Mall Taxes.

In that event that the TCW Property Sale Conditions have been satisfied, Lender shall receive at the closing an amount equal to the Release Price, subject to Lender's agreement that the amount of the Delinquent Mall Taxes will be deducted from the Release Price and paid by the closing agent to satisfy the same.

(i) Lender shall execute and deliver to Borrower or the title or closing agent designated by Borrower a partial release of lien of Lender against its rights in the TCW Property and in the form reasonably acceptable to Lender; and    (ii) Borrower, TCW, and if required, the ground lessor, shall execute such other documents reasonably necessary for to those parties to complete the sale to TCW and that are reasonably acceptable to Lender, (including those documents substantially in the form of the Reciprocal Easement Agreement, First Amendment to Declaration of Easement, First Amendment to Cross Easement for Drainage, Utilities and Access, and Assignment of Entitlement and Developer's Rights emailed on February 7, 2015 from Borrower's counsel, Paul "JJ" Johnson, to Lender's counsel, Pamela M. Brown); provided that any recorded documents transferring the TCW Property expressly state that (1) TCW is assuming all of the obligations associated with the development of the TCW Parcel, and (2) owner and ground lessee of the Mall Related Collateral is not releasing or transferring its interest in any development, zoning, land use, drainage, access, covenants and other rights, including but not limited to the "developer rights" according to the Development of Regional Impact, as amended, ("DRI"), as amended, affecting any of the Real Property, with the exception of those rights and entitlements under the DRI necessary to construct 357 multifamily units and associated parking with average daily trips of 2,281 in the event the TCW Property to transferred to TCW. Except for the foregoing assignment, TCW will acknowledge in a written document acceptable and delivered to Lender that the rights and interests of Lender and any successor in interest or assigns thereof in the development rights, including the DRI, as to the Mall Related Property are not impaired or reduced by the transfer of the TCW Property.

On the closing of the sale of the TCW Property, and before Lender's release of its lien on the TCW Parcel shall be deemed delivered and effective to record, Obligors shall deliver to Lender a specific release

11

and acknowledgment from TCW and whichever of its affiliates of was a party to any contract regarding the TCW Property executed before the commencement of the Bankruptcy Case (the "Pre-petition TCW Contract") stating that they have no claim against Lender arising out of or pertaining to the Pre-petition TCW Contract.

(vi)    If the closing of the sale of the TCW Property and Non-Borrower Property do not occur on or before the TCW Closing Deadline, on the next business day after the TCW Closing Deadline, (1) Guarantor shall pay to Lender by wire transfer to Lender the additional sum of ███████████████ the "Additional Payment"), which together with the Initial Settlement Payment total ██████████████ in the aggregate, all of which shall be retained by the Lender, not subject to setoff, recoupment or claim, to be used or applied by Lender as determined by Lender in its sole discretion, and (2) Obligors shall cause Borrower to execute and submit to Lender (or it assignee) a deed and/or assignment in lieu of foreclosure instrument and bill of sale, and any other documents required to be executed in connection therewith by the title insurance company, for the TCW Property (which is being turned over to Lender), all in the form acceptable to Lender and its title insurance company (the "TCW Property to Lender Transfer Documents").

(vii)   Immediately upon entry of the Lift Stay Order and Settlement Order, Obligors shall cause Borrower to execute and submit to Lender (or its assignee) a deed and/or assignment in lieu of foreclosure instrument and bill of sale for the FSM Collateral less the TCW Property (the "Mall Related Collateral") (both which shall contain anti-merger provisions), and any other documents required to be executed in connection therewith by the title insurance company as described below, in the form acceptable to Lender and its title insurance company (the "Mall Related Collateral Transfer Documents").

(viii)  However, neither the Mall Related Collateral Transfer Documents nor the TCW Property to Lender Transfer Documents, as applicable, shall be deemed delivered until Lender provides Borrower a written notice of acceptance of the delivery of each set of documents (each a "Delivery Notice"), at which times Lender shall cause to be recorded the Mall Related Collateral Transfer Documents and TCW Property to Lender Transfer Documents, as applicable, that are capable of being recorded. The Delivery Notice shall be delivered by Lender to Borrower within 180 days of the their execution and submission to Lender (the "Delivery Deadline"), unless an *in rem* foreclosure judgment for the Mall Related Collateral and, if not transferred to TCW, the TCW Property, as applicable, are entered by the District Court, a foreclosure sale of the Mall Related Collateral or TCW Property, as applicable, has occurred, and the Certificate of Title for the Mall Related Collateral or TCW

12

Property, as applicable, has been issued before the Delivery Deadline, pursuant to the procedures described below; further provided, however, that the recording of the Mall Related Collateral Transfer Documents and TCW Property to Lender Transfer Documents, as applicable, shall not affect Lender's right under this Agreement to obtain an *in rem* foreclosure judgment and order appointing a receiver for the Mall Related Collateral or TCW Property, as applicable, as permitted in this Agreement.

(ix)    Borrower's transfer to Lender all of its right, title and interest in the FSM Collateral as provided in this Agreement shall include and be transferred to Lender (but not be credited against the Initial Settlement Payment or Additional Payment), all cash and monies (1) owned by Borrower that are held by Borrower or any agent thereof or deposited in any account at any financial institution, including any debtor-in-possession accounts on the Effective Date less those amounts necessary to cover expenses incurred but not yet paid by Borrower as authorized by the First Interim Order Granting Debtor's Motion to Use Cash Collateral, Second Interim Order Granting Debtor's Motion to Use Cash Collateral, and Order Approving Payment of Premium Finance, or (2) collected thereafter to the extent funds are owing to Borrower as a result of ownership or operation of the FSM Collateral, including the right to collect any refunds or other payment intangibles, and Obligors shall account to Lender for the same and cause those funds to be delivered to Lender upon collection.

(x)    The transfer of any portion of the FSM Collateral to Lender as provided in this Agreement shall be by execution of a (a) bill of sale and assignment as to personal property free and clear of any liens or security interests except those of Lender or of other secured parties with financing statements filed against personal property and (b) warranty deed and/or assignment of ground lease in lieu of foreclosure (with anti-merger language) as to any of the Real Property so transferred such that Lender is able to obtain insurable title through a title insurance policy ("Title Policy") issued by a title insurance company selected by Lender ("Title Company") that is not subject to interests or liens other than one or more ground leases or the liens of Lender, unpaid real estate taxes for 2017, those on Schedule B-2 of that certain First American Title Insurance Company Title Commitment File No. 2037-3667009, and (c) other assignments, affidavits, as well as other closing documents customarily provided by a seller of a large commercial shopping center in Orange County, Florida, all in the form reasonably acceptable to Lender and the Title Company.

4820-0476-8579.7

## Alternate Mechanics for Transfer/Consent Foreclosure:

If Lender chooses in its discretion as authorized under this Agreement (i) not to accept the assignment and/or deed in lieu of foreclosure and bill of sale documents for the Mall Related Collateral and, if not transferred to TCW as permitted in this Agreement, for the TCW Property, or (ii) to accept those transfer documents with anti-merger provisions, Lender may proceed on an *in rem* basis to foreclose the same, and Borrower agrees and consents to the entry, without any hearing, of an *in rem* judgment of foreclosure of the Mall Related Collateral and TCW Property, as applicable, in the form acceptable to Lender (which may be substantially similar to Florida Supreme Court Form 1.996, Fla. R. Civ. Pro., as may be modified to satisfy the requirements of the District Court), for the amounts due set forth in the complaint plus any advances made by Lender and interest thereon as provided in the Loan Documents and $100,000.00 for unreimbursed attorneys' fees and costs less the amount of the Initial Settlement and Additional Payment, if received, all on an *in rem* basis (also the "Amounts Due"), and all of which Lender may credit bid. The foreclosure sale date may be selected by Lender in its sole discretion. Lender has the option in its sole discretion to conduct a live auction instead of an online foreclosure sale. Obligors agree that without notice or hearing or court order, Lender may file pleadings and motions in the District Case to amend the complaint as Lender determines necessary or appropriate to include interests in the Mall Related Collateral or, if not transferred to TCW, the TCW Property, that Lender asserts are subordinate and subject to being foreclosed therein.

In addition, Borrower consents to the immediate entry in the foreclosure action in the District Case, without a hearing or Lender having to make any proffer or proof of any fact, of an order appointing a receiver for the Mall Related Collateral selected by Lender in its sole discretion, upon Lender filing motion requesting such relief any day after the Effective Date. Borrower agrees to file therein a document in the form acceptable to Lender evidencing its consent immediately upon written request from Lender's counsel (and at Lender's option, Lender may file this Agreement in the alternate, which shall constitute Borrower's consent without need for further filing). The receiver may engage a management company acceptable to Lender, with the amount of any bonds determined by Lender in its sole discretion.  Any receiver appointed pursuant to the preceding sentence shall have, including but not limited to, the power to take possession of, operate, and sell the Mall Related Collateral or TCW Property, as applicable, if not transferred to TCW, or of any portion thereof (the "Receivership Property"). All other terms of the order appointing receiver shall be acceptable to Lender in is sole discretion. Until a receiver is appointed or the Certificate of Title is issued, Obligors agree that the provisions of

14

Section D.(xviii) shall apply. Obligors shall not bear any liability or responsibility for the costs or expenses (including any borrowed funds) of the receivership, unless they fail to comply with their obligations under this Agreement to pay to Lender the Initial Settlement Payment and Additional Payment and to execute and submit to Lender the Mall Related Collateral Transfer Documents, and if the TCW Property has not been transferred to TCW, the TCW Property Transfer, in which case they shall be liable for the reasonable costs and expenses. The receiver may use the revenues of the Receivership Property to pay costs and expenses, and as necessary request Lender to advance funds under receiver's certificates for which Lender, if it makes such advances, shall have a lien on the Receivership Property for the amounts advanced and be entitled to include those advances in the Amounts Due.

(xi)   If Borrower or Guarantor fails to deliver the Initial Settlement Payment to Lender or the Additional Payment to Lender as required in this Agreement ("Payment Breach"), in addition to other rights inuring to Lender under this Agreement or applicable law, Borrower shall be liable for the Amounts Due less any payments received by Lender (the "Borrower Judgment") and Guarantor shall be liable to Lender under the Loan Documents, without defense, offset or claim, the following amounts: (1) any portion of the Initial Settlement Payment and Additional Payment not paid as required in this Agreement, (2) the additional principal amount of ███████████████ plus (3) any fees and costs of collection and enforcement (collectively all of the foregoing, the "Guarantor Judgment"). In the event of a Payment Breach, Obligors further agree that Lender may immediately file in the District Court in the District Case a motion for judgment with an affidavit of default of the Payment Breach, and Obligors waive any right to a hearing, and that the District Court shall enter money damage judgments against Borrower and Guarantor in the Borrower Judgment and the Guarantor Judgment. In the event Borrower or Guarantor fails to immediately satisfy the Borrower Judgment for Guarantor Judgment, as applicable, that non-satisfying party shall be liable to Lender for interest at the statutory rate authorized under applicable law and have the right to recover reasonable attorneys' fees and expenses incurred to enforce the Borrower Judgment and Guarantor Judgment, as applicable.

(xii)   [Intentionally Omitted]

(xiii)   **Obligor Representations and Covenants**:  Obligors represent to Lender and covenants as follows: that no leasing commissions for the FSM Collateral are outstanding and unpaid; that no broker is entitled to any commission in connection with the transfer on account of any agreements made by Obligors; that the January 2017 rent roll delivered to Lender is accurate in all material respects; that Obligors will not

15

make any amendments to any leases, settle any disputes with tenants, or enter into new leases with tenants, without the express written consent of Lender; that they will take no action that would result in the filing of a mechanic's lien against the FSM Collateral, that there is no litigation pending in any court or other tribunal against Obligors regarding the FSM Collateral excepts those identified herein or as disclosed in writing to Lender between the execution of this Agreement and one (1) business day before the Effective Date, and that Obligors shall not themselves file and shall not induce any other person or entity to file any legal action against Lender regarding the Loan, Loan Documents or FSM Collateral or this Agreement or support any such legal action.

(xiv) **Liabilities:**  Except as expressly provided in this Agreement, neither Lender nor its assigns nor any successful bidder at any foreclosure sale of the FSM Collateral is assuming any liabilities or obligations of Obligors or the FSM Collateral, including but not limited to those debts listed in the accounts payable aging report submitted to Lender by Borrower and in the bankruptcy schedules filed in the Bankruptcy Case (the "Pre-Settlement Claims").  This provision does not constitute any admission by Obligors that either of them is liable for any Pre-Settlement Claims.

Except as expressly provided in this Agreement, neither Borrower nor Guarantor is assuming any liabilities or obligations relating to the FSM Collateral incurred by Lender or its agents regarding the FSM Collateral after the Effective Date (the "Post-Settlement Claims").  This provision does not constitute any admission by Lender it is liable for any Post-Settlement Claims.

(xv) **Possession, Control and Management:**  On the earlier of the date Lender accepts the deed and/or assignment in lieu of foreclosure for the Mall Related Collateral (the "Transfer Date"), the date an order appointing receiver is entered in the District Court Case, or the date the certificate of title is issued for the Mall Related Collateral, Obligors shall turnover to Lender and its designed management company or receiver the complete possession, control, and management of the Mall Related Collateral, including all Rents in Borrower's possession or under its control as of such date, including funds in any account at any financial institution or checks or cash proceeds held by Borrower or Borrower's agents that are the proceeds of the Mall Related Collateral. Lender is entitled to collect and Borrower agrees to turnover to Lender and its designated agent any Rents and account receivables and general intangibles to which Borrower is entitled to receive on or after the Transfer Date, the date an order appointing receiver is entered, or the date the certificate of title is issued for the Mall Related Collateral, whichever first occurs, and cause the existing management company,

16

and the existing security and maintenance companies (and other companies providing goods or services to Borrower in which Obligors have any equity interest or are otherwise affiliated, whether directly or indirectly) and their employees and agents to immediately terminate such management, security, or maintenance and any applicable service agreements and deliver to Lender a release by the management, security, and maintenance companies of any claims against the FSM Collateral or Lender regarding such termination in the form acceptable to Lender.

(xvi)    **Books, Records, Keys and Security Deposits:**  On the earlier of the Transfer Date, the date an order appointing receiver is entered, or the date the certificate of title is issued for the Mall Related Collateral, to the extent not delivered as otherwise required by this Agreement, Obligors shall cause to be turned over to Lender or, if designated, its management company, or the receiver, all books and records relating to the Mall Related Collateral, including but not limited to real estate leases, personal property leases, rent rolls, service contracts, accounts payable (which Lender is not assuming) surveys, blueprints, plans and specifications, warranties, permits, service agreements, as also all keys, and deposits held for the benefit of third parties, including security deposits.

(xvii)   **Utility Deposits:**  On the earlier of the Transfer Date, the date an order appointing receiver is entered, or the date the certificate of title is issued for the Mall Related Collateral, Obligors shall execute and deliver to Lender a written direction to the holders of any deposits belonging to Borrower and related to the FSM Collateral to transfer the same and any interest accrued thereon to Lender or it successor in interest or assigns, and in the event of receipt of any refunds of deposits by Obligors or their agents, they shall  cause any deposits funded by Obligors related to the FSM Collateral, including utility deposits, to be immediately turned over to Lender.

(xviii)  **Interim Actions:**    Between execution of this Agreement and the Transfer Date, the date an order appointing receiver is entered, or the date the certificate of title is issued for the Mall Related Collateral, which first occurs, Obligors agree to manage the Mall Related Collateral in a commercially reasonably manner for similarly situated large commercial shopping centers in Orange County, Florida; all subject to the terms of the First Interim Order Granting Debtor's Motion to Use Cash Collateral and Second Interim Order Granting Debtor's Motion to Use Cash Collateral (provided however (i) the management fee reduction (from $33,000 to $16,500) will be modified beginning March 1, 2017, with the monthly management fee increased to $33,000 as of such date, but on a pro-rata basis for the period of time

17

from March 1, 2017 until the earlier of the date that the Lender (or successor in interest or assignee) becomes a mortgagee in possession, if any; the deed and/or assignment in lieu as provided herein is recorded, or a receiver is appointed as provided herein, which modification is only effective provided that the Obligors do not interfere with the foregoing actions of Lender to effectuate possession and control of the Mall Parcel; and (ii) the covenants contained above in Section D.(xiii) shall remain true and correct during the this interim period. No assets of Borrower shall be transferred outside the ordinary of business, except as consented to Lender in writing.

In addition, to the extent the Bankruptcy Case is dismissed and the Borrower's debtor-in-possession accounts are no longer being used, Obligors agree that Rents, if collected by or on behalf of Borrower after the Effective Date and before the Transfer, shall be maintained in a segregated account at a federally insured bank discretion with branches in Orlando, Florida that is selected by Lender in its sole discretion, and said account and the funds therein are hereby pledged to Lender, and Borrower shall execute a deposit pledge agreement immediately after execution of this Agreement, and cause it and the selected depository bank to promptly execute a control agreement, all in the forms acceptable to Lender, as soon as practical after execution of this Agreement but no event later than March 1, 2017. Rents and other "cash collateral" shall be used only to pay operating expenses that are ordinary course. Rents shall not be used to make any payments (a) to Guarantor, (b) to attorneys, accountants, or consultants except those relating to ordinary course landlord-tenant matters, (c) that are distributions or are repayment of loans other than that due to Lender, or (d) that are transfers outside the ordinary course of business, all subject to the terms of the First Interim Order Granting Debtor's Motion to Use Cash Collateral and Second Interim Order Granting Debtor's Motion to Use Cash Collateral. Obligors represent that any rent for the Mall Related Collateral due for the months <u>after</u> February 2017 have not been collected by Obligors or their agents as of the date of this Agreement. Obligors shall not collect rent from tenants in advance as prohibited by the Rents Assignment.

(xix)    <u>**Costs**</u>: Except for attorneys' fee and costs of Obligors, Lender agrees to pay all the reasonable and customary out-of-pocket costs of the transfers of property to Lender contemplated by this Agreement, including the Title Policy, transfer taxes, recording and filing fees, and fees for transferring permits. This covenant excludes any internal costs of Obligors or the fees and expenses of Obligors incurred in connection with the implementation of their obligations under this Agreement.

4820-0476-8579.7

(xx)   **Membership Pledge:** Obligors represent to Lender that the only assets of Borrower is the FSM Collateral. Guarantor's pledge of his 100% equity interest in Borrower shall remain in place until entry of the Settlement Order and Lift Stay Order and Lender's receipt of the Initial Settlement Payment and Additional Payment and recording of the deed and/or assignment in lieu of foreclosure and bill of sale or issuance of the Certificate of Title, as applicable, whereupon Lender agrees to release its lien under the Pledged Documents and file a termination of its lien on the membership interest or authorize Guarantor to do the same.

(xxi)  **Releases**:

(a) Effective, without further action or notice, upon entry of the Settlement Order, Obligors do hereby waive, release, acquit and forever discharge Lender and its subsidiaries, affiliates, predecessors-in-interest, successors, assigns, current and former directors, current and former officers, agents, stockholders, members, partners, attorneys and employees, including but not limited to Betsy Cohen and Daniel Cohen (collectively, "Lender Parties") from any and all claims, causes of action, suits, debts, obligations, liabilities, demands, losses, attorney's fees, costs and expenses, whether known or unknown, suspected or unsuspected, legal or equitable, liquidated or not, contingent or not, which Obligors individually or collectively may have had, now may have or hereafter may have from the beginning of time against any of the Lender Parties, including but not limited to claims or actions arising out of or otherwise relating to (i) this Agreement (except for obligations of Lender under this Agreement), (ii) the Loan, (iii) the FSM Collateral, (iv) the Loan Documents for the Loan, (v) all previous loans or credit facilities between Lender and any Obligors, (vi) any property that formerly served as collateral for any previous loan or credit facility, (vii) any other loans or credit facilities that presently exist between any Obligors and Lender that are not the Loan, (viii) the Fish Entities, Other Fish Entities, and Business Relationship, (ix) the Bankruptcy Case, Adv. Pro. and District Court Case (but expressly excluding any obligations under this Agreement or documents) or (x) any other debtor-creditor relationship between Lender and any of the Obligors or any entity in which Guarantor was or is an equity holder, including without limitation any claims relating to the underwriting, closing, administration, collection or enforcement of the Loan.

(b) Effective, without further action or notice, upon entry of the Settlement Order and the (1) payment to Lender of the Initial Settlement Payment, (2) execution and submission by Borrower to

4820-0476-8579.7

Lender of the deed and/or assignment in lieu of foreclosure for the Mall Related Collateral, (3) payment of Additional Payment, and (4) execution and submission by Borrower to Lender of the deed and/or assignment in lieu of foreclosure for the TCW Property, if not transferred to TCW (Lender's deferral of or decision to not to accept the same shall not be a condition to the effectiveness of the release herein), Lender does hereby waive, release, acquit and forever discharge Obligors, and their subsidiaries, affiliates, predecessors-in-interest, successors, assigns, current and former directors, current and former officers, agents, stockholders, members, partners, attorneys and employees from any and all claims, causes of action, suits, debts, obligations, liabilities, demands, losses, attorney's fees, costs and expenses, whether known or unknown, suspected or unsuspected, legal or equitable, liquidated or not, contingent or not, which Lender Parties individually or collectively may have had, now may have or hereafter may have from the beginning of time against the Guarantor arising out of or otherwise relating to the Guaranty, provided however, anything herein to the contrary notwithstanding, this release does not release (1) Obligors' obligations under this Agreement, and Obligors' agreement to indemnify and hold harmless Lender and its successors in interest and assignees, and if requested in writing, defend at Obligors' expense (subject to consulting with Lender and its successors in interest and assigns regarding all aspects of any case) for any losses or damages incurred or suffered by Lender and its successors in interest or assignees (including attorneys' fees and costs) as a result of any claim asserted in writing or filed against Lender or its successors in interest or assignees (y) by Paul Holland or any member of Office Corporate Park or any other person or entity that was in a venture with Guarantor or Office Corporate Park relating to the proposed re-development of the TCW Property (a "Re-development Party"), regardless of whether Lender or its employees or agents are alleged to have caused any of the damages asserted by a Re-development Party, or (z) by any tenant of the Mall Parcel asserting that Borrower or its agents materially overcharged the tenant under the terms of its lease for common area maintenance through fraudulent conduct (Obligors deny any such overcharging has occurred) (2) any claims of Lender relating to the Key West Loan (which release is addressed by the Key West Settlement Agreement), (3) the Key West Settlement Agreement, (4) the liability of Guarantor, his spouse or UP Development Tennessee, LLC, as applicable, regarding the Remaining Loans (except that Lender waives any default that may exist under the Remaining Loans as of the date of execution of this Agreement; provided Guarantor causes the Acknowledgment required by the Section D.(i)(j) of this Agreement

20

to be delivered to Lender, which Lender agrees to accept in writing), (5) obligations arising from that certain Environmental Indemnity Agreement executed by Borrower regarding the Loan if Borrower or Guarantor in a grossly negligent, reckless or intentional manner violated the terms thereof, and (6) Borrower regarding its obligations under the Loan and Loan Documents, provided, however, Lender covenants not to sue Borrower except as necessary to join Borrower and obtain an *in rem* judgment of foreclosure, including a determination of amounts due and Lender's amount of it credit bid, in event the a foreclosure action is pursued.

(c) <u>**Limited Clawback:**</u>

Anything above in (b) to the contrary notwithstanding, the release from Lender to Obligors herein shall be null and void if Obligors (1) fail to comply with their obligations regarding consenting to the *in rem* foreclosure relief authorized, including entry of the consent foreclosure judgment or entry of the order appointing a receiver as permitted herein; (2) materially breach their representations under Section D.(xiii) above or materially breach their obligations under Section D.(xv through xviii); provided, however, (y) solely as to a claim that Obligors have breached the requirements to (i) turnover "all books and records" under Section D.(xvi); (ii) execute and deliver to Lender written direction to the holders of deposits under Section D.(xvii), or (iii) deliver documents required under Section D.(xviii), or exceeding the budget limitations imposed by the orders described therein, Lender shall give Obligors written notice of a claimed breach, wherein Obligors shall have three (3) business days to cure the described breach, and (z) Lender shall notify Obligors in writing within 150 days of the Effective Date, of any claimed material breach under this provision; otherwise, Lender waives the right to assert a breach under this provision; however, it is further provided there is no time limit, except for applicable statute of limitations unless they have been tolled under law, for Lender to assert a claim under this provision in the event a material violation under Section D.(xv through xviii) constitutes actual fraud. The prevailing party in any litigation under this provision shall be entitled to recover reasonable attorneys' fees and costs.

In addition, if Lender is required to disgorge or otherwise pay to a plaintiff any portion of the Initial Settlement Payment or Additional Payment, or Lender is required to pay damages to a plaintiff that challenges Lender's right to receive any of the FSM Collateral under this Agreement as a "fraudulent transfer," pursuant one or more final judgments entered against Lender in any legal

proceeding based upon the insolvency of Borrower or Guarantor, then the above release to Guarantor shall be null and void, and Guarantor shall be jointly and severally liable to Lender to the extent of said damages suffered by Lender as a result of such final judgment and reasonable attorneys' fees and expenses incurred by Lender in defending those claims and interest thereon at the Florida judgment rate if said damages and fees and expenses are not paid upon demand by Lender.

## E. Miscellaneous Provisions:

(i)  **Assignment**: Lender may assign all of its rights under this Agreement, including the right to credit bid at any foreclosure sale. Neither Borrower nor Guarantor may assign its rights or obligations under this Agreement without the written consent of Lender.

(ii)  **Cooperation:** Obligors agree to and shall cooperate with Lender and use their best efforts in connection with Lender and/or Lender's agents carrying out any and all of the terms and provisions provided for hereunder, and execute such other documents that are reasonably requested by Lender in carrying out the purpose and intent of this Agreement.

(iii)  **Confidentiality:** Except as necessary to enforce this agreement, the redacted terms and conditions of this Agreement are confidential and are not to be disclosed to anyone outside of Lender and Obligors (other than such parties respective legal counsel, directors and officers and other agents, lenders and their counsel who need to know such information in connection with the transactions that are the subject of this Agreement), or the Bankruptcy Court under seal or in camera to obtain entry of the Lift Stay Order, Dismissal Order and Settlement Order. Without the express written consent of Lender or to comply with a lawful order of a court or subpoena, Obligors shall not themselves or through others acting on their behalf, voluntarily disclose to any third person or entity other than their accountants or counsel any non-public information regarding the FSM Collateral, its operations, or any other information and/or documents directly or indirection related to any of the foregoing.

(iv)  **Non-Disparagement.**  Obligors shall not make, publish or communicate to any person, entity or otherwise, or in any public or private forum any remarks, comments or statements (written or oral) that denigrate or disparage, or are detrimental to any of the Lender

22

Parties regarding the Loan or their debtor-creditor relationship, and Lender Parties shall not do likewise as to Obligors. Obligors shall not voluntarily assist any other party who asserts a claim against Lender Parties regarding the subject matters of this Agreement.

(v) **Governing Law/Jurisdiction:** The within Agreement shall be interpreted, construed, enforced in accordance with the internal laws of Florida, without giving effect to its rules or principles governing conflicts of laws that would compel the application of the substantive laws of any other jurisdiction. After entry of the Stay Order, the District Court shall have jurisdiction with respect to any dispute under this Agreement. Once the Dismissal Order has been entered, the Bankruptcy Court shall have, and if it so chooses, may exercise for sixty (60) days after the Effective Date jurisdiction with respect to any dispute pertaining to this Agreement; provided, however, the District Court shall have sole jurisdiction regarding the claims in the District Court Case.

(vi) **Tolling of Statute of Limitations:** Obligors agree that any statute of limitations relating to the Payment Defaults and any other defaults under the loan documents for any of the Loans shall be tolled through the recording of the deed in lieu for the Mall Related Collateral.

(vii) **Notice:** The parties agree that notice under this Agreement shall be sufficient if sent to Scott Fish at scott@updevelopment.com for the Obligors, with a copy to Scott Shuker at rshuker@lseblaw.com and Nicolette Vilmos at nvilmos@broadandcassel.com, and to Dan Sacho at dsacho@thebancorp.com for Lender, with a copy to Douglas Spelfogel at dspelfogel@foley.com and Mark Wolfson at mwolfson@foley.com.

(viii) **Waiver of Jury Trial: The parties waive the right to trial by jury relating to this Agreement or any documents executed as contemplated by the Agreement.**

(ix) **Post-Execution Fees and Costs:** The prevailing party shall be entitled to recover reasonable attorneys' fees and costs in the event a dispute arises under this Agreement after execution hereof.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date set forth above

**UP FIELDGATE US INVESTMENTS –
FASHION SQUARE, LLC,**
a Florida limited liability company

By: _____

23    Scott Fish, Manager

4820-0476-8579.7

Scott Fish, Manager

**SCOTT FISH, INDIVIDUALLY**

**THE BANCORP BANK**, as Lender

By:_____
Name:
Title:

STATE OF Florida
COUNTY OF Orange                )
                                )

    The foregoing Agreement was acknowledged before me this 15 day of February, 2017, by Scott Fish, individually and as Manager of **UP FIELDGATE US INVESTMENTS – FASHION SQUARE, LLC**, a Florida limited liability company, on behalf of the company. He ( ✓ ) is personally known to me or ( ) has produced a _____ Driver's License is identification.

PAUL D. JOHNSON, JR.
MY COMMISSION #FF169596
EXPIRES: NOV 17, 2018
Bonded through 1st State Insurance

Notary Public
My commission expires:
[Notarial Seal]

STATE OF _____
COUNTY OF _____          )
                                  )

    The foregoing Agreement was acknowledged before me this ____ day of February, 2017, by _____ as _____ of **The Bancorp Bank,** a Delaware banking company, on behalf of the company. He ( ) is personally known to me or ( ) has produced a _____ Driver's License as identification.

Notary Public
My commission expires:
[Notarial Seal]

4820-0476-8579.7

Scott Fish, Manager

_____
**SCOTT FISH, INDIVIDUALLY**

**THE BANCORP BANK**, as Lender

By: _____

Name: DANIEL T. SAEID

Title: EVP

STATE OF _____   )
COUNTY OF _____   )

The foregoing Agreement was acknowledged before me this ____ day of February, 2017, by Scott Fish, individually and as Manager of **UP FIELDGATE US INVESTMENTS – FASHION SQUARE, LLC**, a Florida limited liability company, on behalf of the company. He ( ) is personally known to me or ( ) has produced a _____ Driver's License is identification.

_____
Notary Public
My commission expires:
[Notarial Seal]

STATE OF Delaware   )
COUNTY OF New Castle   )

The foregoing Agreement was acknowledged before me this 15th day of February, 2017, by Daniel T. Saeid as EVP of **The Bancorp Bank,** a Delaware banking company, on behalf of the company. He ( ✓ ) is personally known to me or ( ) has produced a _____ Driver's License as identification.

_____
Notary Public
My commission expires: 3/30/19
[Notarial Seal]

4820-0476-8579.7

## EXHIBIT 1

### Fashion Square Mall Loan Documents

(i)     Amended and Restated Loan Agreement ("Loan Agreement").

(ii)    Amended and Restated Promissory Note in the original principal amount of $35,963,812.49 ("Note A").

(iii)   Amended and Restated Promissory Note in the original principal amount of $5,941,343.83, as amended ("Note B").

(iv)    Amended and Restated Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded at Document # 20160232080 of the public records of Orange County, Florida (the "Mortgage").

(v)     Assignment of Rents and Leases recorded in O.R. Book 10522, Page 3455 of the public records of Orange County, Florida ("Rents Assignment").

(vi)    Assignment of Personal Property Leases, Services Agreements, Permits, Licenses, Warranties and Other Agreements ("Other Agreements Assignment").

(vii)   Collateral Assignment of Management Agreement and Subordination of Management Fees Agreement ("Management Assignment").

(viii)  Environmental Indemnity Agreement ("Indemnity"), and

(ix)    Uniform Commercial Code financing statement filed with the Florida Secured Transactions Registry ("Florida UCC").

The Loan Agreement, Note A, Note B, Mortgage, Rents Assignment, Other Agreements Assignment, Management Assignment, Indemnity, Florida UCC, and any other documents executed by Borrower or Guarantor in favor of Lender regarding the Loan and not otherwise defined herein are collectively the "Loan Documents."

4820-0476-8579.7

## Exhibit 2 to FSM Settlement Agreement

## REAL PROPERTY INTERESTS

All UP-Fieldgate US Investments-Fashion Square, LLC, a Florida limited liability company's ("Borrower") fee or leasehold interests in the following real property including land, with the buildings and improvements thereon erected, situate, lying and being in the City of Orlando, County of Orange, State of Florida.

PARCEL A:

Legal Description of the Parcel demised under the Shopping Center Ground Lease: Lot 1, Orlando Fashion Square, according to the plat thereof, as recorded in Plat Book 27, Pages 3 and 74, of the Public Records of Orange County, Florida.

PARCEL B:

Legal Description of the Parcel demised under the Non-Shopping Center Ground Lease: All that certain plot, piece or parcel of land situate, lying and being in the County of Orange, State of Florida, being more particularly described as follows:

A portion of Lot 1, Orlando Office Center, according to the plat thereof, as recorded in Plat Book 12, Pages 62 and 63, of the Public Records of Orange County, Florida, beginning at the corner of said Lot 1 which is located at the intersection of Maguire Boulevard and McCullough Avenue; run North 55°25'47" East along the Southeasterly Right of Way of said Maguire Boulevard 325.54 feet to the Point of Curvature of a curve concave Southeasterly and having a radius of 1900.00 feet; thence Northeasterly along the arc of said curve through a central angle of 14°51'21" a distance of 492.64 feet for the Point of Beginning; thence departing said Right of Way line, run South 34°34'13" East a distance of 254.84 feet; run thence South 55°25'47" West a distance of 166.68 feet; run thence North 34°34'13" West a distance of 20.00 feet; run thence South 55°25'47" West a distance of 469.00 feet; run thence South 34°34'13" East a distance of 267.00 feet; run thence South 55°25'47" West a distance of 40.00 feet; run thence South 34°34'13" East a distance of 95.00 feet; run thence North 55°25'47" East a distance of 343.00 feet; run thence South 34°34'13" East a distance of 252.41 feet; run thence North 60°05'19" East a distance of 115.38 feet to a point 164.4 feet as measured at right angles from the East boundary line of the Southwest 1/4 of Section 20, Township 22 South, Range 30 East, Orange County, Florida; run thence North 00°15'53" West and parallel to said line a distance of 911.75 feet to the Southeasterly Right of Way of said Maguire Boulevard; thence run Southwesterly along the arc of curve concave Southeasterly and having a radius of 1900.00 feet, a central angle of 09°29'30", and an arc distance of 314.76 feet to the Point of Beginning.

Together with the following Easements:

Parcel C-1: Notice to Public of Easement, Restriction and Operating Agreement recorded March 30, 1972 in Official Records Book 2200, Page 404; Consent to Easement, Restriction and Operating Agreement recorded March 30, 1972 in Official Records Book 2200, Page 418; Assignment and Assumption recorded August 8, 1973 in Official Records Book 2438, Page 988; Amendment to Operating Agreement recorded January 28, 1974 in Official Records Book 2494, Page 1326; further amended by Second Amendment to Operating Agreement recorded January 29, 1981 in Official Records Book 3168, Page 2105; further amended by Third Amendment to Operating Agreement recorded November 17, 1983 in Official Records Book 3442, Page 1705; Quit-Claim, Assignment and Assumption Agreement recorded August 28, 1987 in Official Records Book 3915, Page 4223; Assignment and Assumption of Operating Agreement recorded June 1, 1988 in Official Records Book 3985, Page 3782; Fourth Amendment Easement, Restriction and Operating Agreement recorded February 26, 1990 in Official Records Book 4160, Page 1549; Fifth Amendment to Easement, Restriction and Operating Agreement recorded November 2, 1990 in Official Records Book 4233, Page 1783; Sixth Amendment to Easement, 20100155302 Page 55 of 56 Restriction and Operating Agreement recorded May 21, 1992 in Official Records Book 4414, Page 757; Assignment and Assumption of Operating Agreement recorded May 29, 1998 in Official Records Book 5492, Page 1793; Assignment and Assumption of Operating Agreement recorded December 30, 1998 in Official Records Book 5648, Page 69, of the Public Records of Orange County, Florida.

Parcel C-3: Reciprocal Easement Agreement between Barnett Banks of Florida, Inc. and Farlen Orlando Inc., et al., as recorded January 28, 1974 in Official Records Book 2494, Page 1403, of the Public Records of Orange County, Florida.

Parcel C-4: Cross Easement For Drainage, Utilities and Access as recorded on May 22, 1987, in Official Records Book 3889, Pages 472 Through 494, and Amendment to Joinder of Cross Easement for Drainage, Utilities and Access recorded on or about the date hereof in the Public Records Of Orange County, Florida, which refer specifically to those easements described in Official Records Book 3889, at Page 490, Page 491 and Page 494 of the Public Records of Orange County, Florida.

PARCEL C:

Legal Description of the Parcel demised under the Sears Ground Lease:

A parcel of land lying in Section 20, Township 22 South, Range 30 East, City of Orlando, Orange County, Florida, being a portion of Lakewood Estates, as recorded in Plat Book E, Page 13, and lying adjacent to and West of a portion of Lot 1, Orlando Fashion Square (A Replat), as recorded in Plat Book 27, Pages 3 and 4, both in the Public Records of Orange County, Florida, and being more particularly described as follows: Commence at the most Westerly corner of the aforesaid Lot 1, Orlando Fashion Square (A Replat), said point being on the Southeasterly right of way line of Maguire Boulevard; thence leaving said right of way line run South 34°34'13" East along the Westerly boundary line of said Lot 1 a distance of 223.74 feet for a Point of Beginning; thence continue South 34°34'13" East 153.77 feet; thence run South 00°01'30" East 191.96 feet; thence leaving said Westerly boundary line of Lot 1, run North 89°48'41" West

2

310.19 feet; thence run North 00°11'19" East 318.29 feet; thence run South 89°48'41" East 221.81 feet to the Point of Beginning.

In addition, the following:

1.      Lease, dated March 14, 1972, by and between The McCrory Holding Company, a Delaware corporation; The First National Bank at Orlando, as Trustee under the Last Will and Testament of John H. McCullough, deceased; Charlotte Maguire Behrman (formerly Charlotte Maguire) and Raymer F. Maguire, Jr., as Trustees under Article VI of the Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire Behrman, individually, joined by her husband, Mayes Behrman, and Leonard L. Farber, evidenced of record by Memorandum recorded March 17, 1972, in Official Records Book 2194, page 654, of the public records of Orange County, Florida'; Assignment and Assumption Agreement, dated March 14, 1972, by and between Leonard L. Farber, as assignor, and Orlando Joint Venture, a joint venture consisting of ASC of Orlando, Inc., a Florida corporation, RO Associates, a New York limited partnership, Leonard L. Farber, individually, and Alpha Orlando Associates, Ltd., a Florida limited partnership, as assignee, recorded March 17, 1972, in Official Records Book 2194, page 706, of the public records of Orange County, Florida; Assignment and Assumption Agreement, dates as of June 6, 1975, by and between Orlando Joint Venture, consisting of ASC of Orlando, Inc., a Florida corporation, Leonard L. Farber, individually, and RO Associates, a New York limited partnership, with Arlen Realty & Development Corp., as sole general partner, Assignor, and ASC of Orlando, Inc., and Leonard L. Farber, individually, as Cotenants, Assignee, recorded July 28, 1975 in Book 2635, Page 561, of the public records of Orange County, Florida; Modification of Non-Shopping Center Ground Lease Agreement, dated June I, 1980, by and between The McCrory Holding Company, a Delaware corporation; Sun First National Bank of Orlando (successor to The First National Bank At Orlando), as Trustee under The Last Will and Testament of John H. McCullough, deceased; Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F. Maguire, Jr., as Trustees under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire ("**Lessor**"), and Orlando Joint Venture, a joint venture consisting of ASC of Orlando, Inc., a Florida corporation, RO Associates, a New York limited partnership, Leonard L. Farber, individually, and Alpha Orlando Associates, Ltd., a Florida limited partnership ("**Lessee**"), recorded December 5, 1980,. in Official Records Book 3157, page 423, of the public records of Orange County, Florida; Assignment, dated November 13, 1980, by and between Orlando Joint Venture, a joint venture consisting of ASC of Orlando, Inc., a Florida corporation, RO Associates, a New York limited partnership, Leonard L. Farber, individually, and Alpha Orlando Associates, Ltd., a Florida limited partnership, as assignor, and Orlando Joint Venture, a New York Partnership, as assignee, recorded in Official Records Book 3157, page 447, of the public records of Orange County, Florida; Amendment to Non-Shopping Center Ground Lease Agreement, dated May 20, 1987, by and between The McCrory Holding Company, a Delaware corporation; Sun Bank, N.A., successor to Sun First National Bank of Orlando (formerly known as First National Bank of Orlando), as Trustee under the Last Will and Testament of John H, McCullough, deceased; Charlotte Maguire and Raymer F. Maguire, Jr., as Co-Trustees under Article VI of the Last Will and Testament of Raymer F. Maguire, deceased; and Charlotte Maguire, individually ("**Lessor**"), and Orlando Joint Venture, a New York partnership ("**Lessee**"), recorded May 22, 1987, in Official Records Book 3889, page 448, of the public records of Orange County, Florida;

3

Modification of Non-Shopping Center Ground Lease Agreement, dated February 14, 1990, by and between MMM Lakewood, Ltd., a Florida limited partnership (successor-in-interest to The McCrory Holding Company, a Delaware corporation), Sun Bank, N.A. (successor to Sun First National Bank of Orlando), as Trustee under The Last Will and Testament of John H. McCullough, deceased, Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F. Maguire, Jr., as Trustees under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire, individually ("Lessor"); and Fund A Orlando, Inc., a Delaware corporation ("Lessee"), evidenced of record by Memorandum dated February 26, 1990, in Official Records Book 4160, page 1523, of the public records of Orange County, Florida; Fourth Modification of Non-Shopping Center Ground Lease Agreement, dated November 27, 1991, by and between MMM Lakewood, Ltd., a Florida limited partnership (successor-in-interest to The McCrory Holding Company, a Delaware corporation), Sun Bank, N.A. (successor to Sun First National Bank of Orlando), as Trustee under the Last Will and Testament of John H. McCullough, deceased, Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F. Maguire, Jr., as Trustees under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire, individually ("Lessor"); and Fund A Orlando, Inc., a Delaware corporation ("Lessee") (not of record); Fifth Modification of Non-Shopping Center Ground Lease Agreement, dated August 31, 1993, by and between MMM Lakewood, Ltd., a Florida limited partnership (successor-in-interest to The McCrory Holding Company, a Delaware corporation), Sun Bank, N.A. (successor to Sun First National Bank of Orlando), as Trustee under the Last Will and Testament of John H. McCullough, deceased, Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F. Maguire, Jr., as Trustees under Article VI of the Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire, individually, ("Lessor"), and Fund A Orlando, Inc., a Delaware corporation, ("Lessee"), recorded October 28, 1993, in Official Records Book 4642, page 3776, of the public records of Orange County, Florida; Assignment and Assumption of Non-Shopping Center Ground Lease, by and between Fund A Orlando, Inc., a Delaware corporation, and Colonial Realty Limited Partnership, a Delaware limited partnership, dated May 29, 1998, and recorded May 29, 1998, in Official Records Book 5492, page 1757, of the public records of Orange County, Florida; Assignment and Assumption of Non-Shopping Center Ground Lease (an undivided one-half interest) from Colonial Realty Limited partnership to The Prudential Insurance Company of America, dated December 28, 1998 and recorded December 30, 1998, in Official Records Book 5648, page 44, of the public records of Orange County, Florida; and Assignment and Assumption of Non-Shopping Center Ground Lease, dated December 1,2004, by and between Colonial Realty Limited Partnership, a Delaware limited partnership, and The Prudential Insurance Company of America, a New Jersey corporation, as Tenants-in-Common (collectively, "Assignor"), and PR Orlando Fashion Square LLC, a Delaware limited liability Company ("Assignee"), recorded December 2, 2004, in Official Records Book 7722, page 2309, of the public records of Orange County, Florida (collectively, the "Non-Shopping Center Ground Lease").

2.    Lease, dated March 13, 1972, by and between The McCrory Holding Company, a Delaware corporation; The First National Bank at Orlando, as Trustee under the Last Will and Testament of John H. McCullough, deceased; Charlotte Maguire Behrman (formerly Charlotte Maguire) and Raymer F. Maguire, Jr., as Trustees under Article VI of the Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire Behrman, individually, joined by her husband, Mayes Behrman and Leonard L. Farber, evidenced of record by

4

Memorandum recorded March 17, 1972, in Official Records Book 2194, page 642, of the public records of Orange County, Florida; Assignment and Assumption Agreement, dated March 13, 1972, by and between Leonard L. Farber, as assignor, and Orlando Joint Venture, anoint venture consisting of ASC of Orlando, Inc., a Florida corporation, and Leonard L. Farber, individually, a resident of the State of New York, as assignee, recorded March 17, 1972, in Official Records Book 2194, page 700, of the public records of Orange County, Florida; Waiver of Shopping Center Ground Lease Clauses Concerning Federated and Adcor Parcels, dated March 20, 1972; and Agreement of Waiver, Confirmation and Amendment of Lease, dated November 6, 1972, by and between The McCrory Holding Company, a Delaware corporation; The First National Bank at Orlando, as Trustee under the Last Will and Testament of John H. McCullough, deceased; Charlotte Maguire Behrman (formerly Charlotte Maguire) and Raymer F. Maguire, Jr., as Trustees under Article VI of the Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire Behrman, individually, joined by her husband, Mayes Behrman; and Orlando Joint Venture, a joint venture consisting of ASC of Orlando, Inc., a Florida corporation, and Leonard L. Farber, individually, a resident of the State of New York, both documents evidenced of record by Memorandum recorded November 7, 1972 in Official Records Book 2307, page 945, of the public records of Orange County, Florida; Modification of Shopping Center Ground Lease Agreement, dated October 30, 1973, by and between The McCrory Holding Company, a Delaware corporation; Sun First National Bank of Orlando (successor to The First National Bank at Orlando), as Trustee under The Last Will and Testament of John if McCullough, deceased; Charlotte Maguire Behrman (formerly Charlotte Maguire) and Raymer F. Maguire, Jr., as Trustee under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire Behrman, individually, joined by her husband, Mayes Behrman; and Farlen Orlando, Inc., a New York corporation, recorded January 28, 1974, in Official Records Book 2494, page 1414, of the public records of Orange County, Florida; Amendment of Lease, Waiver and Confirmation of Lease, dated January 15,1974, by and between The McCrory Holding Company, a Delaware corporation; Sun First National Bank of Orlando, as Trustee under the Last Will and Testament of John H. McCullough, deceased; Charlotte Maguire Behrman (formerly Charlotte Maguire) and Raymer F. Maguire, Jr., as Trustees under Article VI of the Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire Behrman, individually; and Orlando Joint Venture, a joint venture, consisting of ASC of Orlando, Inc., a Florida corporation, and Leonard L. Farber, individually, a resident of the State of New York, recorded February II, 1974, in Official Records Book 2499, page 563, of the public records of Orange County, Florida; Modification of Shopping Center Ground Lease Agreement, dated July I, 1979, by and between The McCrory Holding Company, a Delaware corporation; Sun First National Bank of Orlando (successor to The First National Bank at Orlando), as Trustee under The Last Will and Testament of John H. McCullough, deceased; Charlotte Maguire Behrman (formerly Charlotte Maguire) and Raymer F. Maguire, Jr., as Trustee under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire Behrman, individually, joined by her husband, Mayes Behrman; and Orlando Joint Venture, a joint venture consisting of ASC of Orlando, Inc., a Florida corporation, Leonard L. Farber, individually, RO Associates, a New York Limited Partnership, and Alpha Orlando Associates Ltd., a Florida limited partnership, evidenced of record by Memorandum recorded January 14, 1980, in Official Records Book 3085, page 1009, of the public records of Orange County, Florida; Modification of Shopping Center Ground Lease Agreement, dated June I, 1980, by and between The McCrory Holding Company, a Delaware corporation; Sun First National Bank of Orlando (successor to

The First National Bank at Orlando), as Trustee under The Last Will and Testament of John H. McCullough, deceased; Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F. Maguire, Jr., as Trustees under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire, individually, and Orlando Joint Venture, a joint venture consisting of ASC of Orlando, Inc., a Florida corporation, RO Associates, a New York limited partnership, Leonard L. Farber, individually, and Alpha Orlando Associates, Ltd., a Florida limited partnership, recorded December 4, 1980, in Official Records Book 3157, page 434, of the public records of Orange County, Florida; Quitclaim Assignment and Assumption Agreement, dated as of November 13, 1980, by and among ASC of Orlando, Inc., a Florida corporation, RO Associates, a New York limited partnership, Leonard L. Farber and Alpha Orlando Associates, Ltd., a Florida limited partnership, as assignor, and Orlando Joint Venture, a New York general partnership, as assignee, recorded on December 5, 1980 in Official Records Book 3157, Page 447, Public Records of Orange County, Florida; Assignment and Assumption of Shopping Center Ground Lease, dated June 1, 1988, by and between Orlando Joint Venture, a joint venture consisting of ASC of Orlando, Inc., a Florida corporation, RO Associates, a New York limited partnership, Leonard L. Farber, individually, and Alpha Orlando Associates, Ltd., a Florida limited partnership, as assignor, and Fund A Orlando, Inc., a Delaware corporation, as assignee, recorded June 1, 1988 in Official Records Book 3985, Page 3765, Public Records of Orange County, Florida; Modification of Shopping Center Ground Lease Agreement, dated as of August 16, 1989, by and between The McCrory Holding Company, a Delaware corporation, Sun Bank, N.A. (successor to Sun First National Bank of Orlando), as Trustee under The Last Will and Testament of John H. McCullough, deceased, Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F. Maguire, Jr., as Trustee under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire, individually and Fund A Orlando, Inc., a Delaware corporation (not of record); Modification of Shopping Center Ground Lease Agreement, dated February 14, 1990, by and between MMM Lakewood, Ltd., a Florida limited partnership, (successor-in-interest to The McCrory Holding Company, a Delaware corporation, Sun Bank, N.A. (successor to Sun First National Bank of Orlando), as Trustee under The Last Will and Testament of John H. McCullough, deceased, Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F. Maguire, Jr., as Trustees under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire, individually) and Fund A Orlando, Inc., a Delaware corporation, evidenced of record by Memorandum dated February 26, 1990, in Official Records Book 4160, page 1533, of the public records of Orange County, Florida; Seventh Modification of Shopping Center Ground Lease Agreement, dated November 27, 1991, by and between MMM Lakewood, Ltd., a Florida limited partnership (successor-in-interest to The McCrory Holding Company, a Delaware corporation, Sun Bank, N.A. (successor to Sun First National Bank of Orlando), as Trustee under the Last Will and Testament of John H. McCullough, deceased, Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F. Maguire, Jr., as Trustees under Article VI of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire, individually) and Fund A Orlando, Inc., a Delaware corporation (not of record); Eighth Modification of Shopping Center Ground Lease Agreement, dated August 31, 1993, by and between MMM Lakewood, Ltd., a Florida limited partnership (successor-in-interest to The McCrory Holding Company, a Delaware corporation) Sun Bank, N.A. (successor to Sun First National Bank of Orlando); as Trustee under The Last Will and Testament of John H. McCullough, deceased, Charlotte Maguire (formerly Charlotte Maguire Behrman) and Raymer F, Maguire, Jr., as Trustees under Article VI

6

of The Last Will and Testament of Raymer F. Maguire, deceased, and Charlotte Maguire, individually, as lessor, and Fund A Orlando, Inc., a Delaware corporation, as lessee, recorded October 28, 1993, in Official Records Book 4642, page 3784, of the public records of Orange County, Florida; Assignment and Assumption of Shopping Center Ground Lease by and between Fund A Orlando, Inc., a Delaware corporation, and Colonial Realty Limited Partnership, a Delaware limited partnership, dated May 29, 1998, and recorded May 29, 1998, in Official Records Book 5492, page 1747, of the public records of Orange County, Florida; Assignment and Assumption of Shopping Center Ground Lease (one-half interest) by and between Colonial Realty Limited Partnership, a Delaware limited partnership, and The Prudential Insurance Company of America, a New Jersey corporation, recorded December 30, 1998, in Official Records Book 5648, page 37, of the public records of Orange County, Florida; and Assignment and Assumption of Shopping Center Ground Lease, dated December I, 2004, by and between Colonial Realty Limited Partnership, a Delaware limited partnership, and The Prudential Insurance Company of America, a New Jersey corporation, as Tenants-in-Common and PR Orlando Fashion Square LLC, a Delaware limited liability company, recorded December 2, 2004, in Official Records Book 7722, page 2297, of the public records of Orange County, Florida (collectively, the "Shopping Center Ground Lease").

3.      Ground Lease, dated February 19, 1992, by and between Sears, Roebuck And Co., a New York corporation and Fund A Orlando, Inc., a Delaware corporation, evidenced of record by Memorandum recorded May 21, 1992, in Official Records Book 4414, page 801, of the public records of Orange County, Florida; Agreement, dated February 19, 1992, by and between Fund A Orlando, Inc. a Delaware corporation and Sears, Roebuck And Co., a New York corporation (not of record); Letter agreement, dated February 19, 1992, by and between Fund A Orlando, Inc. a Delaware corporation and Sears, Roebuck And Co., a New York corporation (not of record); Assignment and assumption lease, dated May 29, 1998, by and between Fund A. Orlando, Inc., a Delaware corporation, as assignor, and Colonial Realty Limited Partnership, a Delaware limited partnership, as assignee (not of record); Lease Supplement, dated December 28, 1998, by and between Fund A. Orlando, Inc., a Delaware corporation, Colonial Realty Limited Partnership, a Delaware limited partnership and Sears, Roebuck And Co., a New York corporation (not of record); Assignment and Assumption of Sears Ground Lease by and between Fund A Orlando, Inc., a Delaware corporation, and Colonial Realty Limited Partnership, a Delaware limited partnership, dated May 29, 1998, and recorded May 29, 1998, in Official Records Book 5492, page 1769, of the public records of Orange County, Florida; Assignment and Assumption of Sears Ground Lease (undivided one-half interest) from Colonial Realty Limited Partnership to The Prudential Insurance Company of America, recorded December 30, 1998, in Official Records Book 5648, page 51, of the public records of Orange County, Florida; and Assignment and Assumption of Sears Ground Lease from Colonial Realty Limited Partnership, a Delaware limited partnership, and The Prudential Insurance Company of America, a New Jersey corporation, as Tenants-in-Common and PR Orlando Fashion Square LLC, a Delaware limited liability company, dated December 1,2004, and recorded December 2,2004, in Official Records Book 7722, page 2321, of the public records of Orange County, Florida; and Assignment and Assumption of Sears Ground Lease dated as of February 9, 2013, by and between PR Orlando Fashion Square LLC, a Delaware limited liability company, as assignor, and UP Fieldgate US Investments -- Fashion Square, LLC, as assignee (collectively, the "Sears Ground Lease"; the Non-Shopping Center Ground Lease, the Shopping Center Ground Lease

7

and the Sears Ground Lease are referred to herein, individually and/or collectively, as the context may require, as the "Ground Lease").

Together with any improvements, buildings, fixtures thereon and any leases, rents, issues and profits thereof (collectively, the "Real Property").

## AND THE FOLLOWING PERSONAL PROPERTY

(a) All fixtures, machinery, machines, motor vehicles, tools, parts, equipment, pumps, engines, motors, boilers, incinerators, building materials, inventory, supplies, goods, systems for the supply or distribution of heat, air conditioning, electricity, gas, water, air or light, elevators and related machinery and equipment, fire prevention and extinguishing equipment, security and access control equipment, plumbing, showers, bath tubs, water heaters, toilets, sinks, stoves, ranges, refrigerators, dishwashers, disposals, laundry equipment, wall, window and floor coverings, partitions, doors, windows, hardware, waste and rubbish removal equipment, recreational equipment, signs, furniture, furnishings, appliances, telephone equipment, computer systems, office equipment and supplies, plants, carpets, rugs, sculptures, art work, mirrors, tables, lamps, beds, television sets, light fixtures, chandeliers, desks, cabinets, bookcases, chairs, sofas, benches, and janitorial and maintenance equipment and supplies, and all substitutions, accessories, accessions, replacements, improvements, and additions to any or all of the foregoing; (b) all deposits, advance payments, security deposits, and rental payments made by or on behalf of Borrower to others in connection with the Real Property and relating to any or all of the following:  (i) management or operational services; (ii) marketing services; (iii) architectural, engineering, or design services; (iv) utility services; (v) cleaning, maintenance, security, or repair services; (vi) rubbish or refuse removal services; (vii) sewer services; (viii) rental of furnishings, fixtures or equipment; (ix) parking; or (x) any service similar to any or all of the foregoing; (c) all reports, appraisals, drawings, plans, blueprints, studies, specifications, certificates of occupancy, building permits, grading permits, and surveys relating to all or part of the Real Property, and all amendments, modifications, supplements, general conditions and addenda thereto; (d) all trade names, trademarks, trade styles, service marks, domain names, computer software and computer software products, logos, letterheads, advertising symbols, goodwill, telephone numbers, advertising rights, negatives, prints, brochures, flyers, pamphlets and other media items used or intended to be used in connection with the Real Property; (e) all warranties and guaranties, whether written or oral, from any person which directly or indirectly relate to all or part of the Real Property or personal property described in parts (a) through (d); (f) all legal and equitable claims, causes of action, and rights against architects, engineers, designers, contractors, subcontractors, suppliers, materialmen and any other Persons supplying labor, services, materials or equipment, directly or indirectly, in connection with the design, planning, construction, development, use, operation, maintenance, or marketing of all or part of the Real Property; (g) all condemnation claims and proceeds, all claims, actions, causes of action, demands, liens, rights, judgments, settlements, awards, compensation, and damages of every kind and nature (including insurance claims and condemnation claims) which Borrower now has or which may hereafter accrue against any person, whether arising in tort, by contract or statute, or in any other manner, which in any way directly or indirectly relate to or arise out of any or all of the following:  (i) the Real Property; (ii) any existing or future fact, matter, occurrence, or transaction relating to the Real Property; or (iii) the design, construction, improvement, development, use, ownership, operation, maintenance,

9

repair or marketing of the Real Property, property proceeds, insurance claims, and insurance proceeds (regardless of whether or not Lender required Borrower to obtain or maintain in effect the insurance policy or insurance policies under which the insurance claims arise or insurance proceeds are payable); (h) all real property tax refund claims, general intangibles (including payment intangibles), letters of credit, letter-of-credit rights, supporting obligations, accounts, deposit accounts, documents, instruments, chattel paper (including electronic chattel paper and tangible chattel paper), health-care-insurance receivables, and accounts receivable relating to the design, planning, construction, development, use, operation, maintenance or marketing of all or part of the Real Property or any business now or hereafter conducted on the Real Property, including any right to payment for goods sold or leased or to be sold or leased or for services rendered or to be rendered, however evidenced, including purchase orders, negotiable documents, notes, drafts, acceptances, claims, instruments, insurance policies, and all other forms of obligations and receivables; (i) all Contracts, (j) (i) the Reserves, (ii) the accounts into which the Reserves have been deposited, (iii) all insurance of said accounts, (iv) all accounts, agreements, contract rights and general intangibles or other rights and interests pertaining thereto, (v) all sums now or hereafter therein or represented thereby, (vi) all replacements, substitutions or proceeds thereof, (vii) all instruments and documents now or hereafter evidencing reserves or such accounts, (viii) all powers, options, rights, privileges and immunities pertaining to reserves (including the right to make withdrawals therefrom), and (ix) all proceeds of the foregoing; (k) all governmental permits, including, but not limited to, certifications, permits, licenses and approvals, and all franchises, patents, copyrights, trademarks and trade names, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Real Property; (l) any and all liquor licenses; and (m) all products and proceeds of any or all of the foregoing assets and personal property, including all money, deposit accounts, accounts, chattel paper, documents, notes, drafts, instruments, insurance proceeds, and all other tangible and intangible property resulting from the sale, lease, or other disposition of any or all of the foregoing personal property, as well as all Borrower's rights in the February 12, 2013 Assignment of Personal Property Leases, Services Agreements, Permits, Licenses, Warranties and Other Agreements and the Collateral Assignment of Management Agreement and Subordination of Management Fees Agreement. Any capitalized term herein shall have the same definition provided in Chapter 679, Florida Statutes, and in the Mortgage defined in the Complaint.

10

## Exhibit 3

## Acknowledgement of Remaining Loans with Bancorp

Scott Fish and Linda  Fish and UP Development Tennessee, LLC (the "Borrowers") hereby acknowledge, reaffirm, and ratify to The Bancorp Bank (the "Lender") that: (1)  the following described loans (the "Remaining Loans") from Lender as evidenced by those certain promissory notes, mortgages, and/or other loan documents executed by them (the "Loan Documents") are valid and in full force and effect according to their terms, without defense or offset, that they waive and release the Bank and its subsidiaries, affiliates, predecessors-in-interest, successors, assigns, and current and former directors, officers, agents, stockholders, members, partners, attorneys and employees from any claims or causes of action, whether known or unknown, relating to the Remaining Loans.

In accepting this Acknowledgement, Lender acknowledges that as of February 14 2017, that payments due under the Loan Documents are current, no defaults exist under the Loan Documents based upon the representations of Borrowers that the collateral for the Remaining Loans are insured and any taxes owing to government agencies are current, as required by the terms of the Loan Documents.

| Loan No. | Collateral | Current Pr. Bal. |
|---|---|---|
| ██████████ | Airplane | ████████████ |
| ██████████ | TN Residence | ████████████ |

Linda Fish represents and warrants to Lender that she has no interest of any kind in the following entities or any entity that owns or holds an interest in any property owned by the following entities, and she acknowledges that she has no claim against Lender relating to the same:  UP – Fieldgate US Investments–Fashion Square, LLC, UP Development Key West Holdings, LLC; UP Development Key West, UP Millenia Expo, LLC, HM-UP Development Alafaya Trail, LLC, HM-UP Development Alafaya Trail-Tru, LLC, Up Development Corporate Park Office Building, LLC ("Corporate Park Office"), UP Strikeout, LLC, Fishman's Seafood, LLC, FSM Security, LLC, FSM Maintenance, LLC, UP Development Company LLC, UP Strike Out, LLC, UP Management – Fashion Square, LLC, and UP Development Tennessee, LLC (the "Fish Entities").

_____

Scott Fish

_____

Linda Fish

UP Development Tennessee, LLC
By: _____
Printed Name:  Scott Fish
Title: Manager

**The Bancorp Bank Accepts the above Fish Acknowledgement of Remaining Loans with Bancorp**

The Bancorp Bank
By: _____
Printed Name: _____
Title: _____

## Fish Acknowledgement of Remaining Loans with Bancorp-Execution Page

STATE OF                        )
                                )        ss:
COUNTY OF                       )

Before me, on this ____ day of _____, 2017, Scott Fish, individually and as Manager of UP Development Tennessee, LLC, who is personally known to me or produced _____ as personal identification, has executed this Acknowledgment.

                                _____
                                Notary Public

STATE OF                        )
                                )        ss:
COUNTY OF                       )

Before me, on this ____ day of _____, 2017, ___ Fish, who is personally known to me or produced _____ as personal identification, has executed this Acknowledgment.

                                _____
                                Notary Public

STATE OF                        )
                                )        ss:
COUNTY OF                       )

Before me, on this ____ day of _____, 2017, _____ as _____ of The Bancorp Bank, who is personally known to me or produced _____ as personal identification, has executed this Acknowledgment.

                                _____
                                Notary Public

2

## Exhibit 4-Vehicle Leases

| Leases | Year | Make | Model | VIN # | 1/31/17 Balance |
|--------|------|------|-------|-------|-----------------|
| 12377-34133 | 2014 | Ram | 1500 TRADESMAN QUAD 2W | 1C6RR6FG8ES339564 | |
| 12377-41908 | 2009 | Isuzu | N-Series | J8BC4W16097001328 | |



PROPERTY FOR ACQUISITION:
8.35 AC NON-SHOPPING CENTER LEASE PARCEL
2.11 AC OFFICE PARCEL
3.76 AC SHOPPING CENTER LEASE PARCEL
0.81 AC SHOPPING CENTER LEASE PARCEL
TOTAL: 15.03 AC

8.35 AC
NON-SHOPPING CENTER
LEASE PARCEL

2.11 AC
OFFICE PARCEL

3.76 AC
SHOPPING CENTER
LEASE PARCEL

0.81 AC
SHOPPING CENTER

**LOCHRANE**

201 SOUTH BUMBY AVENUE ORLANDO, FLORIDA 32803
PH: (407) 89-5511 FAX: (407) 896-9167 EMAIL: WWW.LOCHRANE.COM

| JOB NO: | 12055.20 | |
| SCALE: | NO SCALE | EXHIBIT A |
| DATE: | 12.03.14 | |

EXHIBIT